## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION

Kay Diane Ansley, Catherine "Cathy" McGaughey, Carol Ann Person, Thomas Roger Person, Kelley Penn, and Sonja Goodman,

Plaintiffs,

vs.

Marion Warren, in his Official Capacity as Director of the North Carolina Administrative Office of the Courts,

Defendant,

Case No.: 1:16-cv-0054

and

Phil Berger, President Pro Tempore of the North Carolina Senate, and Tim Moore, Speaker of the North Carolina House of Representatives, on behalf of the North Carolina General Assembly,

Proposed Defendant-Intervenors.

## BRIEF IN SUPPORT OF THE NORTH CAROLINA GENERAL ASSEMBLY'S MOTION TO INTERVENE

Robert D. Potter, Jr.
Attorney at Law
2820 Selwyn Ave., Suite 840
Charlotte, NC 28209
(704) 552-7742
rdpotter@rdpotterlaw.com

John C. Eastman*
CENTER FOR CONSTITUTIONAL JURISPRUDENCE
c/o Chapman University Fowler School of Law
One University Dr.
Orange, CA 92866
(877) 855-3330
(714) 844-4817 Fax
jeastman@chapman.edu

James A. Campbell*
Kenneth J. Connelly*
Douglas G. Wardlow*
Jonathan Caleb Dalton*
ALLIANCE DEFENDING FREEDOM
15100 North 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 Fax
jcampbell@ADFlegal.org
kconnelly@ADFlegal.org
dwardlow@ADFlegal.org
cdalton@ADFlegal.org

*Attorneys for Proposed Defendant-Intervenors*
*Notice of Appearance to be filed*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES......................................................................................ii

INTRODUCTION ........................................................................................... 1

ARGUMENT.................................................................................................. 3

I.     The General Assembly is entitled to intervene as of right under Rule
       24(a)(2). ................................................................................................ 3

       A.     The General Assembly has timely moved to intervene. ............................ 3

       B.     The General Assembly has significantly protectable interests in the
              subject matter of this action, and the resolution of this suit, if
              Plaintiffs prevail, will impair those interests and the General
              Assembly's ability to protect them................................................. 4

       C.     The General Assembly's significantly protectable interests may not
              be adequately represented by the Attorney General, an outspoken
              Senate Bill 2 opponent who prefers that it not be the law. ................ 11

II.    The General Assembly should alternatively be granted permissive
       intervention under Rule 24(b)(1)(B). ................................................. 15

CONCLUSION ............................................................................................ 17

# TABLE OF AUTHORITIES

***Cases*:**

*Alt v. EPA,*
    758 F.3d 588 (4th Cir. 2014) .................................................................................3

*Arizonans for Official English v. Arizona,*
    520 U.S. 43 (1997).................................................................................................5

*Baity v. Cranfill,*
    91 N.C. 293 (1884) ...............................................................................................9

*Blake v. Pallan,*
    554 F.2d 947 (9th Cir. 1977) ..............................................................................10

*Board of Education of Central School District No. 1 v. Allen,*
    392 U.S. 236 (1968)..............................................................................................8

*Bostic v. Schaefer,*
    760 F.3d 352 (4th Cir. 2014) ..............................................................................14

*Cascade Natural Gas Corp. v. El Paso Natural Gas Co.,*
    386 U.S. 129 (1967)..............................................................................................4

*Coleman v. Miller,*
    307 U.S. 433 (1939)..............................................................................................6

*Diamond v. Charles,*
    476 U.S. 54 (1986)................................................................................................4

*Donaldson v. United States,*
    400 U.S. 517 (1971)..............................................................................................4

*Feller v. Brock,*
    802 F.2d 722 (4th Cir. 1986) ..........................................................................3, 13

*General Synod of the United Church of Christ v. Resinger,*
    12 F. Supp. 3d 790 (W.D.N.C. 2014) ..................................................................9

*General Synod of the United Church of Christ v. Resinger,*
    No. 3:14-Cv-00213-MOD, 2014 WL 5094093 (W.D.N.C. Oct. 10, 2014)......................14

*Henry v. Edmisten,*
    340 S.E.2d 720 (N.C. 1986)..................................................................................7

Case 1:16-cv-00054-MOC-DLH   Document 20   Filed 03/17/16   Page 3 of 24

*Hines v. D'Artois*,
    531 F.2d 726 (5th Cir. 1976) .......................................................................10

*Hollingsworth v. Perry*,
    133 S. Ct. 2652 (2013)...............................................................................4, 5

*I.N.S. v. Chadha*,
    462 U.S. 919 (1983)........................................................................................6

*JLS, Inc. v. Public Service Commission of West Virginia*,
    321 Fed. Appx. 286 (4th Cir. 2009)..............................................................14

*Karcher v. May*,
    484 U.S. 72 (1987).........................................................................................5

*Kootenai Tribe of Idaho v. Veneman*,
    313 F.3d 1094 (9th Cir. 2002) ......................................................................16

*Massachusetts Board of Retirement v. Murgia*,
    427 U.S. 307 (1976)........................................................................................7

*Obergefell v. Hodges*,
    135 S. Ct. 2584 (2015)....................................................................................9

*Orange Environment, Inc. v. County of Orange*,
    917 F. Supp. 1051 (S.D.N.Y. 1993)...............................................................6

*Planned Parenthood of Mid-Missouri & E. Kansas, Inc. v. Ehlmann*,
    137 F.3d 573 (8th Cir. 1998) ..........................................................................5

*Reich v. ABC/York-Estes, Corp.*,
    64 F.3d 316 (7th Cir. 1995) ............................................................................3

*Sagebrush Rebellion, Inc. v. Watt*,
    713 F.2d 525 (9th Cir. 1983) ........................................................................11

*Saine v. State of North Carolina*,
    709 S.E.2d 379 (N.C. Ct. App. 2011) .............................................................6

*Schweiker v. Wilson*,
    450 U.S. 221 (1981)........................................................................................7

*In re Sierra Club*,
    945 F.2d 776 (4th Cir. 1991) ........................................................................11

Case 1:16-cv-00054-MOC-DLH   Document 20   Filed 03/17/16   Page 4 of 24

*Southwest Center for Biological Diversity v. Berg*,
    268 F.3d 810 (9th Cir. 2001) ............................................................3

*Spicer v. Spicer*,
    607 S.E.2d 678 (N.C. Ct. App. 2005) ..........................................7, 8

*State v. Warren*,
    114 S.E.2d 660 (N.C. 1960) ..............................................................7

*Teague v. Bakker*,
    931 F.2d 259 (4th Cir. 1991) ....................................................3, 4, 14

*Trbovich v. United Mine Workers of America*,
    404 U.S. 528 (1972)..........................................................................11

*United States v. City of Los Angeles*,
    288 F.3d 391 (9th Cir. 2002) ............................................................3

*Wilderness Society v. United States Forest Service*,
    630 F.3d 1173 (9th Cir. 2011) ........................................................16

## <u>*Constitutional and Statutory Provisions*</u>:

U.S. Const. amend. I ..................................................................................8

N.C. Const. art. I, § 13 ..............................................................................8

N.C. Const. art. I, § 19 ..............................................................................8

N.C. Const. art. II, § 1 ...............................................................................6

N.C. Const. art. II, § 20 .............................................................................6

N.C. Const. art. VI, § 7 ..............................................................................8

N.C. Gen. Stat. § 1-72.2 ........................................................................5, 6

N.C. Gen. Stat. § 11-4................................................................................8

N.C. Gen. Stat. § 11-7................................................................................8

N.C. Gen. Stat. § 41A-6(a)(3).....................................................................8

N.C. Gen. Stat. § 51-1................................................................................9

N.C. Gen. Stat. § 51-6................................................................................9

N.C. Gen. Stat. § 51-8.....................................................................................................9

N.C. Gen. Stat. § 105-278.3..........................................................................................8

### *Other Authorities*:

Anne Blythe, *Former Magistrate Files Suit Challenging Mandate To Perform Same-Sex Marriages*, The News & Observer, Feb. 11, 2015, http://www.newsobserver.com/news/politics-government/state-politics/article10859018.htm...........................................................................10

Charles Alan Wright et al., Federal Practice and Procedure (3d ed. 1998)................................ 14

*Former North Carolina Magistrates Sue Over Same-Sex Marriages*, ABC 11 News, Apr. 9, 2015, http://abc11.com/news/former-north-carolina-magistrates-sue-over-same-sex-marriages/644674/..........................................................................................................................10

Gary D. Robertson, *Cooper Would Veto Religious Exemption Bills if NC Governor*, Associated Press, Apr. 8, 2015, http://www.jdnews.com/article/20150408/News/304089896.........1, 2, 12, 13

Gavin Off, *NC Magistrates Resign Over Gay Marriage Rulings*, The Charlotte Observer, Oct. 25, 2014, http://www.charlotteobserver.com/news/local/article9206057.html .......................9, 10

Roy Cooper (@RoyCooperNC), Twitter (June 11, 2015, 1:25 PM), https://twitter.com/RoyCooperNC/status/609094156565291008........................................2, 12, 13

*Roy Cooper Speaks Out Against Magistrate Opt-Out Law*, WECT News, June 12, 2015, http://www.wect.com/story/29309528/roy-cooper-speaks-out-against-magistrate-opt-out-law ....................................................................................................................................12, 13

Tom Foreman Jr. and Gary D. Robertson, *Lawsuit Challenges Gay Marriage Law in North Carolina*, Associated Press, Dec. 9, 2015, http://bigstory.ap.org/article/2b6acbf6a3e346bfa6884f177b3299fd/lawsuit-challenges-gay-marriage-law-north-carolina ......................................12

# INTRODUCTION

The advent of same-sex marriage brought many Americans a legal change that they had long sought, but it also created a crisis of conscience for magistrates who believe that their own religious convictions prevent them from participating in those ceremonies. This situation singularly implicated the General Assembly because it has the duty to protect both the right to religious liberty and the right to access marriage. In response, the General Assembly sought, through Senate Bill 2, to balance the competing interests of religiously convicted citizens and all couples seeking marriage. Given its obligation to protect both of these interests, the General Assembly has a direct and significant interest in Senate Bill 2's continued vitality and enforceability—in ensuring that both religious liberty and access to marriage are affirmed in the law.

Despite the workable and nationally acclaimed compromise that Senate Bill 2 struck, and despite no allegation that anyone has been denied a marriage to which he or she is entitled under the law, Plaintiffs have challenged it, claiming that it is an unconstitutional establishment of religion and a violation of equal-protection and due-process guarantees. Plaintiffs have named the Director of the North Carolina Administrative Office of the Courts as the defendant, and he will be represented by the Attorney General's office. But that office cannot adequately defend Senate Bill 2 because the Attorney General has been an outspoken public opponent of that law and the policy it embodies.

The Attorney General has, for instance, stated that he would veto the law if he had the chance. Gary D. Robertson, *Cooper Would Veto Religious Exemption Bills if NC Governor*, Associated Press, Apr. 8, 2015, http://www.jdnews.com/article/20150408/News/304089896. In other words, he has stated that he does not think Senate Bill 2 should be the law in North Carolina. And he has also publicly proclaimed that he believes Senate Bill 2 "hurt[s] people" and

1

families. *Id*; *see also* Roy Cooper (@RoyCooperNC), Twitter (June 11, 2015, 1:25 PM), https://twitter.com/RoyCooperNC/status/609094156565291008 (stating that Senate Bill 2 will "hurt NC families"). Statements like these, which effectively agree with allegations in Plaintiffs' Complaint, have raised significant doubts about the Attorney General's role in serving as the State's defender of Senate Bill 2. *See* Compl. ¶¶ 97, 107 (ECF No. 1) (alleging that "Senate Bill 2 *harm*s third parties" by, among other things, "singl[ing] out gay and lesbian couples[] and reject[ing] with animus" their right to form *families* through marriage) (emphasis added).

Simply put, the Attorney General's ability to adequately defend Senate Bill 2 is compromised from the outset by his public advocacy campaign against the very law that he is tasked with defending. There is no way to maintain that the Attorney General can properly discharge his responsibility of defending a statute that he has so publicly denigrated and so openly stated should not be the law in North Carolina.

In light of this, Proposed Defendant-Intervenors Phil Berger, President Pro Tempore of the North Carolina Senate, and Tim Moore, Speaker of the North Carolina House of Representatives, on behalf of the North Carolina General Assembly, seek to intervene in this case pursuant to Fed. R. Civ. P. 24 for the purpose of defending Senate Bill 2's constitutionality. As explained below, the General Assembly is entitled to intervene as of right under Rule 24(a)(2), or in the alternative, this Court should grant permissive intervention under Rule 24(b)(1). Allowing the General Assembly to intervene as a party to this litigation is the only way to ensure that its interests are adequately represented. Thus, the General Assembly's Motion to Intervene should be granted.

**ARGUMENT**

**I.     The General Assembly is entitled to intervene as of right under Rule 24(a)(2).**

Federal Rule of Civil Procedure 24(a)(2) provides that "[o]n timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Thus, intervention must be granted as of right if an applicant demonstrates that (1) its motion is timely, (2) it has an interest in the subject matter of the action, (3) the action may as a practical matter impair or impede the applicant's ability to protect that interest, and (4) the applicant's interest may not be adequately represented by existing parties to the litigation. *Teague v. Bakker*, 931 F.2d 259, 260-61 (4th Cir. 1991). As explained below, the General Assembly satisfies all of these intervention requirements.

"Liberal intervention is desirable" to ensure that cases include "as many apparently concerned persons as is compatible with efficiency and due process." *Feller v. Brock*, 802 F.2d 722, 729 (4th Cir. 1986); *see also United States v. City of Los Angeles*, 288 F.3d 391, 397-98 (9th Cir. 2002) ("A liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts."). Moreover, the court should "accept as true the non-conclusory allegations made in support of an intervention motion." *Southwest Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 819 (9th Cir. 2001); *Reich v. ABC/York–Estes Corp.*, 64 F.3d 316, 321 (7th Cir. 1995) (same).

**A.     The General Assembly has timely moved to intervene.**

Courts look to three factors in determining timeliness: "first, how far the underlying suit has progressed; second, the prejudice any resulting delay might cause the other parties; and third, why the movant was tardy in filing its motion." *Alt v. EPA*, 758 F.3d 588, 591 (4th Cir. 2014).

Here, the General Assembly filed this intervention request at the earliest stages of the suit, before the parties filed any responsive pleadings. This intervention request thus will not prejudice the existing parties, and the Court should conclude that the timeliness requirement is satisfied.

**B.** **The General Assembly has significantly protectable interests in the subject matter of this action, and the resolution of this suit, if Plaintiffs prevail, will impair those interests and the General Assembly's ability to protect them.**

"Rule 24(a) does not specify the nature of the interest required for a party to intervene as a matter of right," but "the Supreme Court has recognized that '[w]hat is obviously meant . . . is a significantly protectable interest.'" *Teague*, 931 F.2d at 261 (quoting *Donaldson v. United States*, 400 U.S. 517, 531 (1971)). Although the Supreme Court has not delineated what qualifies as a significantly protectable interest, it has recognized that "certain public concerns may constitute an adequate 'interest'" for purposes of intervention. *Diamond v. Charles*, 476 U.S. 54, 68 (1986) (citing *Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129, 135 (1967)).

Here, the elected leaders of the North Carolina Senate and House of Representatives, acting on behalf of the entire General Assembly, have several significantly protectable interests in this litigation entitling them to intervene as a matter of right. Those include (1) representing the State's interest in the continued enforceability of statutes enacted by the General Assembly, (2) the General Assembly's institutionalized interest in its core lawmaking function, and (3) the General Assembly's interest in balancing its duty to protect religious-liberty rights and its duty to ensure access to marriage for everyone. The disposition of this lawsuit, if Plaintiffs prevail, will impair those interests and the General Assembly's ability to protect them.

1. *The State's Interest in the Continued Enforceability of Statutes Enacted by the General Assembly.* This lawsuit seeks to enjoin the continued enforcement of Senate Bill 2. *See* Compl. ¶ 99 (seeking "an Order enjoining" Senate Bill 2). The State itself undoubtedly "has a

4

cognizable interest in the continued enforceability of its laws." *Hollingsworth v. Perry*, 133 S.

Ct. 2652, 2664 (2013) (quotation marks omitted). "To vindicate that interest . . . , a State must be

able to designate agents to represent it in federal court. That agent is typically the State's

attorney general. But state law may provide for other officials to speak for the State in federal

court . . . ." *Id.* (citation omitted).

Exercising this power, states often give their legislatures or legislative leadership

authority to speak for them in federal court. In *Karcher v. May*, 484 U.S. 72 (1987), for example,

the "New Jersey Legislature had authority under state law to represent the State's interests" in

federal court, *id.* at 82, and that authority enabled the State's presiding legislative officers to

intervene in a case that (like this one) raised an Establishment Clause challenge to a state statute.

*See id.* at 75, 77 (explaining that the intervenors participated in the lawsuit "in their official

capacities as presiding officers on behalf of the New Jersey Legislature"). When state law

affords a legislative body this authority to represent the State's interest in the continued

enforceability of its laws, the legislature has independent legal standing that permits it to defend

the State's laws. *See, e.g.*, *Arizonans for Official English v. Arizona*, 520 U.S. 43, 65 (1997)

(noting that "state legislators have standing . . . if state law authorizes legislators to represent the

State's interests"); *Planned Parenthood of Mid-Missouri & E. Kansas, Inc. v. Ehlmann*, 137 F.3d

573, 578 (8th Cir. 1998) ("[L]egislators may obtain standing to defend the constitutionality of a

legislative enactment when authorized by state law.").

Here, North Carolina law appoints the leaders of the General Assembly, on behalf of that

legislative body, to represent the State's interests in cases (like this one) that challenge the

constitutionality of a state statute:

> The Speaker of the House of Representatives and the President Pro Tempore of
> the Senate, as agents of the State, shall jointly have standing to intervene on

behalf of the General Assembly as a party in any judicial proceeding challenging a North Carolina statute or provision of the North Carolina Constitution.

N.C. Gen. Stat. § 1-72.2. Because this statute empowers the General Assembly to represent the State's interest when a litigant contests the continued enforceability of a state statute, the General Assembly undoubtedly has a significantly protectable interest in the subject of this case. And because Plaintiffs ask this Court for an order enjoining Senate Bill 2, *see* Compl. ¶ 99, the disposition of this litigation, if the Court sides with Plaintiffs, will impair the State's interest in the continued enforceability of its laws.

2.     *The General Assembly's Institutionalized Interest in its Core Lawmaking Function.* All "legislative power of the State" is "vested in the General Assembly." N.C. Const. art. II, § 1. Thus, the General Assembly alone has the power to enact laws in North Carolina. N.C. Const. art. II, § 20; *see also Saine v. State*, 709 S.E.2d 379, 384 (N.C. Ct. App. 2011) ("The power of the General Assembly to pass all needful laws, except when barred by constitutional restrictions, is plenary[.]").

In light of this, the General Assembly "undoubtedly has institutional interests in its . . . lawmaking powers," *Orange Env't, Inc. v. Cty. of Orange*, 817 F. Supp. 1051, 1056 (S.D.N.Y. 1993); *see also* N.C. Gen. Stat. § 1-72.2 (recognizing this interest by granting the General Assembly standing to intervene in judicial proceedings "challenging a North Carolina statute"); *Coleman v. Miller*, 307 U.S. 433, 438 (1939) (concluding that state legislators have "a plain, direct and adequate interest in maintaining the effectiveness of their votes").[1] That institutional interest is directly implicated in this case because Plaintiffs ask this Court to strike down Senate Bill 2 and thereby nullify that exercise of the General Assembly's lawmaking authority.

_____

[1] Congress similarly has been allowed to intervene in cases challenging federal statutes for the purpose of defending the exercise of its core lawmaking authority. *See, e.g.*, *INS v. Chadha*, 462 U.S. 919, 930 n.5, 939-40 (1983) ("Congress is … a proper party to defend the constitutionality of [the challenged statute].").

Additionally, the threat that this lawsuit poses to the General Assembly's lawmaking power does not end with the invalidation of Senate Bill 2. The first claim in Plaintiffs' Complaint alleges that Senate Bill 2 violates the Establishment Clause of the First Amendment to the United States Constitution. *See* Compl. ¶¶ 86-100. Plaintiffs claim that because Senate Bill 2 addresses a demonstrated need for religious accommodation, its "primary purpose and effect . . . is to endorse and further the primacy of a specific religious belief about marriage." *Id.* at ¶ 90. But if that position is ratified by this Court, Plaintiffs will not only overturn Senate Bill 2, they will create a judicial precedent that forbids the General Assembly from creating future religious accommodations or maintaining or expanding existing ones.

Plaintiffs also claim that Senate Bill 2 violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. That claim, if successful, would hinder the General Assembly's ability to legislate in myriad contexts because "the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one." *Schweiker v. Wilson*, 450 U.S. 221, 234-35 (1981) (quoting *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 314 (1976)). So if Plaintiffs prevail on their Equal Protection claim, they will create precedent that has a far-reaching effect on the General Assembly's lawmaking power every time it considers a bill that grants benefits to some and not others.

3.       *The General Assembly's Interest in Balancing its Duty to Protect Religious-Liberty Rights and its Duty to Ensure Access to Marriage for Everyone.* The General Assembly has a duty to promote the "general welfare of society," *State v. Warren*, 114 S.E.2d 660, 664 (N.C. 1960), by "balanc[ing] the weight to be afforded to disparate interests and . . . forg[ing] a workable compromise among those interests," *Henry v. Edmisten*, 340 S.E.2d 720, 731 (N.C. 1986); *see also Spicer v. Spicer*, 607 S.E.2d 678, 684 (N.C. Ct. App. 2005) ("A decision

regarding how to balance these interests . . . falls uniquely within the purview of the General Assembly."). This balancing process requires the General Assembly to harmonize the various constitutional and statutory duties imposed on it.

One such duty is the General Assembly's constitutional obligation to protect the freedom of its citizens to live according to their sincerely held religious beliefs. *See* N.C. Const. art. I, § 13 ("All persons have a natural and inalienable right to worship Almighty God according to the dictates of their own consciences, and no human authority shall, in any case whatever, control or interfere with the rights of conscience."); N.C. Const. art. I, § 19 ("[N]or shall any person be subjected to discrimination by the State because of . . . religion"); U.S. Const. amend. I (forbidding any law that "prohibit[s] the free exercise" of religion).[2] As a result, the General Assembly has consistently sought to safeguard the free exercise of religion by balancing that constitutional right against competing interests. *See, e.g.*, N.C. Gen. Stat. § 41A-6(a)(3) (exempting from the State's Fair Housing Act "[r]eligious institutions . . . which give preference to members of the same religion in a real estate transaction"); N.C. Gen. Stat. § 11-4 (providing that a person with a religious or conscientious objection to swearing an oath may instead make an affirmation and omit the phrase "so help me God"); N.C. Gen. Stat. § 105-278.3 (exempting real and personal property used for religious purposes from property-tax liability). In doing so, the General Assembly has endeavored to create a tolerant and diverse community where people of all faiths are welcomed and valued.

---

[2] Each member of the General Assembly, as part of their oath of office, affirms their duty to uphold these constitutional guarantees. *See* N.C. Const. art. VI, § 7; N.C. Gen. Stat. § 11-7; *see also Bd. of Educ. of Cent. Sch. Dist. No. 1 v. Allen*, 392 U.S. 236, 241 n. 5 (1968) (concluding that government officials' "oath to support the . . . Constitution" affords them "a 'personal stake in the outcome' of . . . litigation").

The General Assembly also has a duty to regulate marriage in the State. As the North Carolina Supreme Court has acknowledged, "[t]he whole subject [of marriage] is one of legislative regulation . . . ." *Baity v. Cranfill*, 91 N.C. 293, 298 (1884). The General Assembly is thus the sole entity with authority to prescribe the terms for entering a marriage. *See id.* (noting that "[t]he legislature has the power to declare what shall be valid marriages"). Through its statutes, the Legislature requires eligible couples to (among other things) obtain a marriage license from a register of deeds, *see* N.C. Gen. Stat. § 51-6 (requiring couple to obtain license); N.C. Gen. Stat. § 51-8 (requiring register of deeds to issue license); and solemnize the marriage before an authorized celebrant, *see* N.C. Gen. Stat. § 51-1.

Following this Court's decision in *General Synod of the United Church of Christ v. Resinger*, 12 F. Supp. 3d 790 (W.D.N.C. 2014), which authorized same-sex couples to marry in North Carolina, a conflict arose between same-sex couples' right to access marriage and the "decent and honorable religious" convictions, *Obergefell v. Hodges*, 135 S. Ct. 2584, 2602 (2015), of magistrates and employees in registers of deeds' offices who believe that marriage is the unique union of a man and a woman (and thus cannot in good conscience facilitate the formation of any other union as a marriage). *See, e.g.*, *id.* at 2625 (Roberts, C.J., dissenting) (observing that a judicial decision that redefines marriage to include same-sex couples "creates serious questions about religious liberty"); *id.* at 2638 (Thomas, J., dissenting) (explaining that a judicial decision that redefines marriage "threatens the religious liberty our Nation has long sought to protect"). Indeed, as Plaintiffs admit, this conflict caused some magistrates to resign their positions. *See* Compl. ¶ 51; Gavin Off, *NC Magistrates Resign Over Gay Marriage Rulings*, The Charlotte Observer, Oct. 25, 2014, http://www.charlotteobserver.com/news/local/

article9206057.html.[3] Faced with this difficult situation, the General Assembly acted, for it alone had the power and constitutional duty to balance these competing interests and implement a compromise.

Long-established case law confirms that a public official or government entity has a sufficient interest to intervene as of right in a lawsuit that will affect its official duties. *See Blake v. Pallan*, 554 F.2d 947, 953 (9th Cir. 1977) ("A state official has a sufficient interest in adjudications which will directly affect his own duties and powers . . . ."); *Hines v. D'Artois*, 531 F.2d 726, 738 (5th Cir. 1976) (allowing a public official "to intervene as of right" "[o]n the basis of the relation between [his] . . . duties and the claims for relief made by plaintiffs"). Here, the General Assembly has constitutional and statutory duties to protect the religious liberty of its citizens and to regulate the marriage-formation process in a manner that ensures access for everyone. Because this lawsuit (by seeking to undo Senate Bill 2) will directly affect the General Assembly's ability to protect those interests, the General Assembly has a significantly protectable interest in the outcome of this proceeding.

If Plaintiffs obtain judgment in their favor, the disposition of this case will impair the General Assembly's interest in balancing its duty to protect religious-liberty rights and its duty to ensure access to marriage for everyone. Most obviously, a ruling for Plaintiffs would strike down the balance between those duties that the General Assembly selected and codified in Senate Bill

---

[3] Some magistrates filed lawsuits arguing that then-existing state and federal laws already required the State to accommodate this conflict between one of their job functions and their deeply held religious beliefs. *See* Anne Blythe, *Former Magistrate Files Suit Challenging Mandate To Perform Same-Sex Marriages*, The News & Observer, Feb. 11, 2015, http://www.newsobserver.com/news/politics-government/state-politics/article10859018.html (discussing lawsuit filed by former Moore County magistrate); *Former North Carolina Magistrates Sue Over Same-Sex Marriages*, ABC 11 News, Apr. 9, 2015, http://abc11.com/news/former-north-carolina-magistrates-sue-over-same-sex-marriages/644674/ (discussing lawsuit filed by former Swain County magistrate and former Graham County magistrate).

2. In addition, Plaintiffs' Establishment Clause claim threatens to set judicial precedent that will significantly restrict, if not effectively forbid, the General Assembly from creating future religious accommodations in the marriage-formation context and beyond. *See supra* at 7.

**C.    The General Assembly's significantly protectable interests may not be adequately represented by the Attorney General, an outspoken Senate Bill 2 opponent who prefers that it not be the law.**

The Supreme Court has affirmed that the inadequate-representation requirement "is satisfied if the applicant shows that representation of his interest *'may be'* inadequate." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972) (emphasis added); *accord In re Sierra Club*, 945 F.2d 776, 779-80 (4th Cir. 1991). "[T]he burden of making that showing should be treated as minimal." *Trbovich*, 404 U.S. at 538 n.10.

An applicant seeking to intervene as a defendant satisfies this requirement when it shows that the existing defendant, even if presenting a defense of a challenged law, is sympathetic to the plaintiffs' position or goals. This principle is illustrated in *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525 (9th Cir. 1983). There, the defendant government official (the Secretary of the Interior) was formerly the head of an organization that was representing the plaintiff in its challenge to a government policy regarding the use of federal land. *Id.* at 528. That fact, according to the court of appeals, showed that the government defendant might not adequately represent the intervenor's interest in defending the challenged government policy, and thus the court concluded that the intervention motion must be granted. *Id.*

Here, the case for inadequacy of representation is even stronger than the case in *Sagebrush Rebellion* because the current representative of the State's interests—Attorney General Roy Cooper—has plainly and repeatedly stated that he opposes Senate Bill 2 and prefers that it not be the law. Indeed, while the General Assembly was considering Senate Bill 2, the Attorney General engaged in a public advocacy campaign against it, declaring in no uncertain

terms that he would veto the bill if he were Governor. Gary D. Robertson, *Cooper Would Veto Religious Exemption Bills if NC Governor*, Associated Press, Apr. 8, 2015, http://www.jdnews.com/article/20150408/News/304089896 (hereinafter "Robertson, *Cooper Would Veto*"). After the General Assembly enacted Senate Bill 2 and overrode the Governor's veto, the Attorney General took to social media and continued to denounce the newly enacted law. *See* Roy Cooper (@RoyCooperNC), Twitter (June 11, 2015, 1:25 PM), https://twitter.com/RoyCooperNC/status/609094156565291008 (hereinafter "Cooper, Twitter") (referring to Senate Bill 2 as a "bad idea"). And more recently, following Plaintiffs' filing of their first lawsuit against Senate Bill 2, the Attorney General (while stating that he would defend the bill) reaffirmed his opposition to Senate Bill 2. *See* Tom Foreman Jr. and Gary D. Robertson, *Lawsuit Challenges Gay Marriage Law in North Carolina*, Associated Press, Dec. 9, 2015, http://bigstory.ap.org/article/2b6acbf6a3e346bfa6884f177b3299fd/lawsuit-challenges-gay-marriage-law-north-carolina ("Attorney General Roy Cooper . . . said Wednesday that he personally opposed the magistrates' law . . . ."). Given the Attorney General's outspoken opposition to Senate Bill 2 and his clear desire that it not be the law, he is not an adequate representative of the General Assembly's interests.

The Attorney General has mentioned some of alleged reasons why he opposes Senate Bill 2. For example, he baselessly claims that the bill will "hurt NC families." Cooper, Twitter; *see also Roy Cooper Speaks Out Against Magistrate Opt-Out Law*, WECT News, June 12, 2015, http://www.wect.com/story/29309528/roy-cooper-speaks-out-against-magistrate-opt-out-law (hereinafter "*Cooper Speaks Out*") (stating that Senate Bill 2 is "bad for our families"). And he has stated, without any support, that Senate Bill 2 is "bad for jobs" and "the economy." *Cooper Speaks Out*. These comments (and others like them) demonstrate the likelihood that the Attorney General will not be an adequate defender of the General Assembly's interests in Senate Bill 2.

Furthermore, the Attorney General's public statements about Senate Bill 2 indicate that he agrees with some of Plaintiffs' allegations, thereby undermining his ability to defend the law. *See Feller*, 802 F.2d at 730 (finding that an intervenor satisfied the inadequate-representation prong "in light of [the government defendant's] admission at oral argument that . . . it agrees with the [plaintiffs]"). For example, Plaintiffs allege that "Senate Bill 2 harms third parties" by, among other things, "singl[ing] out gay and lesbian couples[] and reject[ing] with animus" their right to form families through marriage. Compl. ¶¶ 97, 107 (emphasis added). Appearing to agree with this, the Attorney General has similarly stated, as mentioned above, that he believes Senate Bill 2 "hurt[s] people" and families. Robertson, *Cooper Would Veto*; *see also* Cooper, Twitter (stating that Senate Bill 2 will "hurt NC families"); *Cooper Speaks Out* (stating that Senate Bill 2 is "bad for our families"). Statements like these have compromised the Attorney General's ability to adequately defend against (or even deny) some of Plaintiffs' allegations against Senate Bill 2.

Beyond his open disdain for Senate Bill 2 in particular, the Attorney General has also expressed antagonism toward laws that protect religious freedom in general, and he has shown disregard for people in need of such protection. In fact, he has callously stated that the magistrates and employees in register of deeds' offices who experienced a crisis of conscience after the State began recognizing same-sex marriages "should fulfill the job that they were hired to do." Robertson, *Cooper Would Veto*. He also publicly proclaimed that if he were Governor, he would veto a state Religious Freedom Restoration Act ("RFRA") should one be enacted by the General Assembly. *Id.* Because the Attorney General has been (and continues to be) opposed to laws that safeguard religious liberty like Senate Bill 2 does, he cannot adequately represent the General Assembly's interest in regulating access to marriage in a manner that protects the free

exercise of religion. *See* 7C Charles Alan Wright et al., Federal Practice and Procedure § 1909 (3d ed. 1998) ("[I]f . . . existing parties are adverse to the [intervention applicant's interest], then there is no adequate representation.").

The Attorney General's open hostility toward laws protecting religious freedom (including Senate Bill 2 in particular) creates a significant chance that he will be less vigorous than the General Assembly in defending against Plaintiffs' claims. This wide discrepancy between the Attorney General's nonexistent interest in defending Senate Bill 2 and the General Assembly's undeniably strong interest in defending that law further supports the General Assembly's case for intervention. *See Teague*, 931 F.2d at 262 (finding the inadequate-representation prong satisfied because "there [wa]s a significant chance that [the existing defendants] might be less vigorous than the . . . [i]ntervenors in defending" against the plaintiffs' claims); *JLS, Inc. v. Pub. Service Comm'n of W. Va.*, 321 Fed. Appx. 286, 292 (4th Cir. 2009) (unpublished) (reversing a district court's denial of intervention where the intervenors "show[ed] that their litigation of th[e] suit . . . would be . . . more vigorous" than that of the existing state defendant).

The facts surrounding this intervention request are distinguishable from the General Assembly's attempt to intervene in *General Synod of the United Church of Christ v. Resinger*, No. 3:14-CV-00213-MOC, 2014 WL 5094093 (W.D.N.C. Oct. 10, 2014). There, the General Assembly argued that the Attorney General did not adequately represent its interest because he conceded the unconstitutionality of the challenged state law in the wake of the Fourth Circuit's decision in *Bostic v. Schaefer*, 760 F.3d 352 (4th Cir. 2014). In other words, the General Assembly's inadequate-representation argument rested on its critique of the Attorney General's litigation strategy and decision-making.

Here, however, the inadequate-representation argument is quite different. The General Assembly has shown that the Attorney General's ability to adequately defend Senate Bill 2 is compromised from the outset by his public advocacy campaign against the very law that he is tasked with defending. There is simply no way to maintain that the Attorney General can properly discharge his responsibility of defending a statute that he has so publicly denigrated and so openly stated should not be the law in North Carolina. Thus, although this Court found that the inadequate-representation prong was not satisfied in *General Synod*, the same conclusion cannot be reached here.

In short, no private party would be required to retain, as an "adequate representative," an attorney who publicly campaigned against that party's interest. Justice requires no less for the defense of laws duly enacted by the General Assembly. Thus, the General Assembly should be allowed to intervene to ensure that its interests are adequately represented.

## II. The General Assembly should alternatively be granted permissive intervention under Rule 24(b)(1)(B).

The General Assembly is entitled to intervention as of right for the reasons set out above. But in the alternative, it should be granted permissive intervention. Unlike intervention as of right, an intervention applicant need not show a significantly protectable interest or inadequacy of representation to intervene permissively. Rather, to qualify for permissive intervention, the applicant need only show that (1) the intervention request is timely filed, (2) the applicant "has a claim or defense that shares with the main action a common question of law or fact," and (3) the intervention will not "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(1)(B).

Each of those prerequisites is satisfied here. First, the General Assembly has already established that its motion is timely, *see supra* at 3-4, and the same argument applies with equal

force here. Second, the General Assembly will present a defense "that shares with the main action a common question of law or fact." Plaintiffs' claims and the General Assembly's defenses both involve the constitutionality of Senate Bill 2: Plaintiffs seek a declaration that Senate Bill 2 violates the Establishment Clause of the First Amendment and the Equal Protection and Due Process Clauses of the Fourteenth Amendment; and the General Assembly contends that it does not. These arguments present inextricably intertwined and completely overlapping questions of law. Third, given that no undue delay or prejudice will result from allowing the General Assembly to intervene, permissive intervention is proper here.

Moreover, "the magnitude of this case" weighs in favor of allowing the General Assembly to intervene. *See Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1111 (9th Cir. 2002) (upholding a grant of permissive intervention where the lower court concluded that "the magnitude of this case is such that . . . intervention will contribute to [its] equitable resolution"), *abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011). Over the last few years, the states have been struggling to balance the new rights of same-sex couples to marry and our nation's longstanding constitutional commitment to religious liberty. Senate Bill 2 represents one of the most notable legislative attempts to achieve a workable balance so that competing rights and interests can peacefully coexist. Whether that legislation passes constitutional muster presents a legal issue of significant magnitude. The importance of this question demands that the General Assembly be permitted to intervene to ensure that Senate Bill 2 is zealously defended by the State of North Carolina.

Furthermore, permissive intervention should be granted because the General Assembly's participation as a party will assist this Court in resolving the constitutional questions presented here. After all, the General Assembly is uniquely situated to address Plaintiffs' arguments.

Plaintiffs allege, for example, that Senate Bill 2's "primary purpose . . . is to endorse and further the primacy of a specific religious belief about marriage," Compl. ¶ 90, and that the General Assembly "did not undertake any balancing of the individual and state interests, *id.* at ¶ 91. No one is better suited than the General Assembly to respond to these allegations regarding the purpose, design, and history of Senate Bill 2. Thus, the Court would benefit from the General Assembly's intervention in this case.

## CONCLUSION

For the foregoing reasons, the motion to intervene should be granted.

Date: March 17, 2016

Respectfully submitted,

/s/ Robert D. Potter, Jr.

Robert D. Potter, Jr.
Attorney at Law
2820 Selwyn Ave., Suite 840
Charlotte, NC 28209
(704) 552-7742
rdpotter@rdpotterlaw.com

John C. Eastman*
CENTER FOR CONSTITUTIONAL JURISPRUDENCE
c/o Chapman University Fowler School of Law
One University Dr.
Orange, CA 92866
(877) 855-3330
(714) 844-4817 Fax
jeastman@chapman.edu

James A. Campbell*
Kenneth J. Connelly*
Douglas G. Wardlow*
Jonathan Caleb Dalton*
ALLIANCE DEFENDING FREEDOM
15100 North 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 Fax
jcampbell@ADFlegal.org
kconnelly@ADFlegal.org
dwarlow@ADFlegal.org
cdalton@ADFlegal.org

*Attorneys for Proposed Defendant-Intervenors*

*Notice of Appearance to be filed*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 17, 2016, I electronically filed the foregoing paper with the Clerk of Court by using the CM/ECF system.

All participants in the case are registered CM/ECF users and will be served by the CM/ECF system.

Date: March 17, 2016

/s/ Robert D. Potter, Jr.
Robert D. Potter, Jr.