Kay Diane Ansley, Catherine "Cathy"
McGaughey, Carol Ann Person, Thomas Roger
Person, Kelley Penn, and Sonja Goodman,

       Plaintiffs,

       v.

Marion Warren, in his Official Capacity as
Director of the North Carolina Administrative
Office of the Courts,

       Defendant.

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS

Now come Plaintiffs, through undersigned counsel, and submit this response to Defendant Warren's motion to dismiss their Complaint.

## INTRODUCTION

In its argument regarding prudential standing, Defendant discloses the essential dispute in this matter—whether there are constitutional limits on the State's power to tax and spend. Defendant says there are none:

> State governments, no less than the federal government, possess certain unalienable powers that the other may not encroach upon. . . . . A sovereign state must have the authority to determine how tax revenues are to be spent, extending to the total conduct of a state's fiscal affairs.

[DE 39 at 27] As explained *infra*, however, the Supreme Court has made clear that there are "specific bulwark(s)" or constitutional checks on how tax revenues are to be spent, one of them being the First Amendment. Plaintiff's lawsuit and their standing to bring it rely on those checks.

## STANDARD OF REVIEW

For purposes of Defendant Warren's motion to dismiss under Rule 12(b)(6), the Court must accept as true the complaint's factual allegations and draw all reasonable inferences in Plaintiffs' favor. *See, e.g., Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1998) Allegations have facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

In considering a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the plaintiff has the burden of showing that subject matter jurisdiction exists. *See Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). The reviewing court should "only" grant the Rule 12(b)(1) motion to dismiss, however, "if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id*. *See also Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). A Rule 12(b)(1) motion tests the "legal sufficiency of the complaint," but "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Eastern Shore Markets, Inc v. J.D. Assoc. Ltd. Partnership*, 213 F.3d 175, 180 (4th Cir. 2000).

To survive a motion to dismiss for improper venue when no evidentiary hearing is held, the plaintiff need only make a prima facie showing of venue. *See Mitrano v. Hawes,* 377 F.3d 402, 405 (4th Cir. 2004)

## STATEMENT OF THE FACTS

On Defendant's motion to dismiss, the Court must take the following facts as true:

Under the second and third clauses of Article VI, the United States Constitution is the "supreme Law of the Land," which every judge in every state must swear to uphold and "be

bound" by in the face of any state law that contradicts it. [DE 1 ¶¶ 9-12] North Carolina has incorporated that supremacy clause into Article VI, § 7 of its Constitution and into N.C.G.S. § 11-7, both of which require that all elected or appointed public officials—including judges—must uphold the Federal Constitution as part of the faithful discharge of their official duties. [DE 1 ¶¶ 13-17]

North Carolina magistrates are judicial officials. They take the judicial oath and have statutorily enumerated judicial powers, including the specific duty to preside over and solemnize non-religious, civil marriage ceremonies. Any magistrate who violates the oath to uphold the Federal Constitution or who willfully refuses to discharge any statutory duty is subject to removal from office and misdemeanor charges. [DE 1 ¶¶ 18-27]

On October 10, 2014, this Court ruled in *General Synod of the United Church of Christ v. Reisinger* that the North Carolina marriage ban violated the Fourteenth Amendment, and it denied motions by representatives of the state legislature to intervene in the lawsuit. [DE 1 ¶¶ 29-37] On October 13, 2014, Defendant Warren's predecessor at the Administrative Office of the Courts ("AOC") issued a directive to all magistrates to conduct marriages for couples presenting a marriage license. [DE 1 ¶ 38]

On October 14, 2014, the federal court in the Middle District ruled in two related cases that the North Carolina marriage ban violated the Fourteenth Amendment, but granted a motion to intervene by legislative leaders for appellate purposes. The same day, counsel for the AOC issued a legal memorandum to all judges stating that any magistrate who refused to marry a same sex couple would violate the judicial oath of office. The North Carolina Institute of Government issued a similar memo to the state's Chief District Court judges. [DE 1 ¶¶ 39-47]

A handful of state magistrates resigned rather than accept the Court's ruling. On October 24, 2014, legislative leaders submitted a letter to Defendant Warren's predecessor at the AOC, objecting to the directive to magistrates to conduct marriages and asking that it be revised to allow for "reasonable accommodation" of magistrates' religious beliefs. The AOC responded by acknowledging that many magistrates had religious objections to the court rulings and had resigned to resolve that personal conflict, but that other magistrates with equally sincere religious beliefs support marriage equality and/or see the distinction between a civil ceremony and a religious one. Defendant Warren's predecessor declined to modify the directive. [DE 1 ¶¶ 48-51]

At the opening of the next legislative session in January 2015, Sen. Berger, the President Pro Tempore of the State Senate, who had moved to intervene in the marriage equality lawsuits, filed "Senate Bill 2" to allow magistrates to recuse themselves from performing marriage duties "due to sincerely held religious objection." The bill allowed for a religious-based denial of the oath of office, to wit: a refusal to recognize the Fourteenth Amendment right of gay and lesbian citizens to marry. It declared that refusing to perform marriages would not violate the oath of office or be cause for removal or a basis for a misdemeanor charge. [DE 1 ¶¶ 52-59] It similarly protected assistant registers of deeds from carrying out their duties.

Senate Bill 2 ordered the expenditure of tax dollars to effect this religious exemption from the judicial oath to uphold the Federal Constitution. It directed the AOC to transport a magistrate into a county to perform marriages if and when all magistrates in that county recused themselves from conducting marriages. It also directed the AOC to pay into the retirement system sufficient funds—both the employee and employer shares—to bridge the break in service for any magistrate who had resigned rather than perform their statutory and constitutional duties, but who was then reappointed as magistrates after Senate Bill 2 became law. [DE 1 ¶¶ 62-65]

4

The Senate passed the legislation on February 25, 2013. Defendant Warren was named Director of the AOC effective May 1, 2015. The House passed the bill on May 28, 2015. [DE 1 ¶¶ 66-69]

The Governor of North Carolina vetoed the bill but the Legislature overrode the veto on June 11, 2015. On June 26, 2015, the U.S. Supreme Court ruled that laws prohibiting people of the same sex from participating in the institution of marriage violate the Fourteenth Amendment. [DE 1 ¶¶ 70-73]

All of the magistrates in McDowell County have recused themselves from performing marriages rather than support and uphold the Fourteenth Amendment right to marry. As directed by Senate Bill 2, Defendant Warren has expended and continues to expend public funds to transport a magistrate from Rutherford County to McDowell County to perform marriages there. As a result, every gay and lesbian citizen in McDowell County knows that every magistrate in their county has officially rejected their right to full citizenship and equality, and that their tax dollars have been used to further that disavowal of their rights. [DE 1 ¶¶ 76-82]

Further, Defendant Warren, as directed by Senate Bill 2, has used tax dollars to pay into the retirement system funds to bridge service credit for magistrates who resigned rather than uphold this Court's ruling, but were reinstated after Senate Bill 2 became law. [DE 1 ¶¶ 83-85]

The primary purpose and effect of these expenditures is to endorse and further the primacy of a specific religious belief against marriage equality above the constitutional recognition of the right to marry. [DE 1 ¶¶ 89-90]

## I.    THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANT WARREN.

Defendant erroneously asserts that this Court lacks personal jurisdiction over Defendant Warren, arguing that Plaintiffs have failed to allege sufficient facts to show the needed connection between Defendant Warren and the "enforcement" of Senate Bill 2. In fact,

5

Defendant Warren is the state official responsible for the implementation of Senate Bill 2, administering the payments from taxpayer funds to effect the recusals of all magistrates in McDowell County, and the payment of service credit to the magistrates who resigned rather than recognize the right of gay and lesbian citizens to marry but were then reappointed under the recusal statute. [DE 1 ¶¶ 4, 28, 63, 65] Indeed, Senate Bill 2 was passed in part in reaction to the refusal of Warren's predecessor to implement a religious exemption from upholding the right to marry. Defendant Warren is now the willing administrator of that systematic religious-based disavowal of the oath to uphold the Federal Constitution.

Plaintiffs have pled ample facts to establish personal jurisdiction over Defendant Warren under *Ex Parte Young*, 209 U.S. 123 (1908) and its progeny. "To ensure the enforcement of federal law … the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law." *Frew ex. rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004). While the Eleventh Amendment confers immunity over the states, a state official can be sued for prospective, injunctive relief, who "attempts to use state power in violation of the Constitution." *Sch. Bd. of City of Charlottesville, Va. v. Allen*, 240 F.2d 59, 63 (4th Cir. 1956). The *Ex parte Young* exception to Eleventh Amendment immunity requires simply that the defendant official have "some connection with the enforcement of the act." 209 U.S. at 157.

The Fourth Circuit has held that an official who has a "special relationship" to the alleged violation of federal law is the proper defendant. *S. Carolina Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 332-33 (4th Cir. 2008). *Limehouse* held that the required "'special relation' under *Ex parte Young* has served as a measure of *proximity to* and *responsibility for* the challenged state action." *Limehouse*, 549 F.3d at 333. The goal is to ensure that "a federal injunction will be effective with respect to the underlying claim." *Id.* at 333.

6

Here, Plaintiffs seek prospective, injunctive relief against the chief official charged with supervising and carrying out the provisions of the challenged statute. Plaintiffs specifically pled that Senate Bill 2 directs Defendant Warren, "as Director of the NCAOC … to use public funds for a religious purpose." [DE 1 ¶ 4] And that "Defendant Warren oversees and manages the administration of the judicial system and is well aware that magistrates are judicial officials subject to these provisions of law as well as the judicial oath of office." [DE 1 ¶ 28]

In *Limehouse*, the Fourth Circuit found the director of the state transportation agency who possessed supervisory authority over South Carolina's drafting of an environmental impact statement for a federally funded bridge project satisfied the proximity and responsibility requirements. That director advanced arguments strikingly similar to Defendant Warren's.[1] He argued that the "special relation" condition was not met because he was not "charged with any duty under a federal statute or … with enforcement of a state statute." The Fourth Circuit rejected his arguments:

> As the administrative head of the agency with responsibility for carrying out its policies and representing the agency in its dealings with the federal government, the Director possesses a sufficient connection to the alleged violation of federal law.

*Id.* at 333.

Similarly*,* Defendant Warren is the administrative head of *the* agency responsible for administering and giving effect to Senate Bill 2, which was passed when his predecessor defied the demand of legislative leaders for an opt-out provision. The law directs the AOC director to spend public funds to further that religious disavowal of the Fourteenth Amendment. He spends those funds as part of his statutory duties under N.C.G.S. § 51-5.5, which makes him responsible for the expenditure of taxpayer funds to operate the court system. His spending has enabled all

---

[1] Defendant has claimed: "Indeed, by virtue of North Carolina General Statutes and the State's Constitution, Defendant is not empowered to enforce Senate Bill 2." [DE 39 at 16]

of the McDowell County magistrates to recuse themselves from their marriage duties under Senate Bill 2. [DE 1 ¶¶ 63-65] The proximity and responsibility prongs under *Limehouse* are both met.

The Fourth Circuit applied *Ex parte Young* to find jurisdiction over a similar defendant in *Bostic v. Schaefer*, 760 F.3d 352, 371 (4th Cir. 2014), *cert. denied*, 135 S. Ct. 308 (2014), *cert. denied sub nom. McQuigg v. Bostic*, 135 S. Ct. 314 (2014), the case that led to this Court's order repealing discriminatory marriage laws. It found Defendant Rainey—the Registrar of Vital Records for Virginia—responsible for developing Virginia's marriage license application form and distributing it to the circuit court clerk. Her administrative role in the marriage process was sufficient to assert jurisdiction. A federal district court had reached the same conclusion in *Harris v. McDonnell*, 988 F. Supp. 2d 603, 609 (W.D. Va. 2013).

Because of his duties promulgated by the legislature, Defendant Warren is the only proper party. Plaintiffs could not name individual magistrates to obtain injunctive relief; they are the beneficiaries of the law with no power over its implementation. Nor could Plaintiffs sue the Chief Justice of the North Carolina Supreme Court, as Defendant suggests. Warren is *the* state official responsible for Senate Bill 2's implementation; he is the one properly subject to the injunctive relief sought.[2]

---

[2] Naming of Warren is consistent with a long line of Supreme Court First Amendment challenges to federal spending for a religious purpose. In *Flast v Cohen*, 392 U.S. 83 (1968), the defendant was the Secretary of Health Education and Welfare who administered the federal spending program authorized by Congress. In *Lemon v. Kurtzman*, 403 U.S. 602 (1971), a First Amendment challenge to *state* spending, the defendants were the heads of Pennsylvania's and Rhode Island's state education agencies—both charged with implementing a legislative initiative. In *Committee for Public Ed. & Religious Liberty v. Nyquist*, 413 U.S. 756 (1973), a First Amendment challenge to state spending on religious schools, the defendant was the Commissioner of Education. And in *Arizona Christian School Tuition Org. v. Winn*, 563 U.S. 125 (2011), the most recent high court case on taxpayer standing, the defendant was the Director for the State Department of Revenue who administered the tax credit program established by the state legislature. Defendant plays the equivalent role of all of these defendants: administering a challenged program that was adopted by a legislature.

There are, of course, cases where the court does not have personal jurisdiction. These are cases where the named state official, unlike Defendant Warren, lacked any responsibility for administering funds or any other authority in connection with a challenged law. *See*, *e.g.*, *Hutto v. S. Carolina Ret. Sys.*, 773 F.3d 536, 550 (4th Cir. 2014) (defendants were not responsible for deducting employee contributions from paychecks to fund retirement system); *Wright v. N. Carolina*, 787 F.3d 256 (4th Cir. 2015) (legislators had no role in administering election law).

The claims against Warren are also clearly distinguishable from cases where a Governor was not a proper defendant; though he possessed general authority to enforce state laws, he had no administrative role regarding the specific laws at issue. *See Waste Mgmt. Holdings v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001). In considering whether a defendant has sufficient enforcement powers to fall under the *Ex parte Young* exception, the Fourth Circuit will look at the duties enumerated by statute. *See McBurney v. Cuccinelli*, 616 F.3d 393, 400 (4th Cir. 2010) (after parsing the statutory duties of the attorney general, finding he lacked any authority to enjoin violations of the Virginia Freedom of Information Act).

By statute, Defendant Warren's duties include: "ensure[ing] overall compliance with federal and State laws"; determining the number of "magistrates required for the efficient administration of justice"; overseeing an Internal Audit Division that "evaluates and discloses potential weaknesses in the effectiveness of internal controls in the court system for the purpose of safeguarding public funds and assets and minimizing incidences of fraud, waste, and abuse"; "inspect[ing] and review[ing] the effectiveness and efficiency of processes and proceedings conducted by judicial officers;" and "prepare[ing] and submit[ing] budget estimates of State appropriations necessary for the maintenance and operation of the Judicial Department, and *authoriz[ing] expenditures from funds appropriated for these purposes*." N.C.G.S. § 7A-343.

9

(emphasis added). To state it simply, by statute, Defendant Warren runs the Judicial Department and is the state official responsible for implementing or "enforcing" Senate Bill 2.

Thus, this Court has jurisdiction over Defendant Warren under *Ex parte Young* on Plaintiffs' claim for prospective, injunctive relief.

## II.     PLAINTIFFS HAVE STANDING TO BRING THIS CAUSE OF ACTION.

### A.     Plaintiffs Have Standing As Taxpayers to Challenge Public Spending That Violates the First Amendment.

Defendant next argues that Plaintiffs lack standing under *Flast v. Cohen,* 392 U.S. 8 (1968) to pursue their First Amendment claim. Defendant argues mistakenly that *Flast* standing does not apply to state spending; that the Complaint fails to show the "logical link" required under *Flast* between the challenged spending ordered by the legislature and Plaintiff's taxpayer status; and that Plaintiff cannot show any nexus between the spending and their ability to marry. Each of these arguments misapprehends *Flast* and its progeny; and the last argument misapprehends the First Amendment claim entirely.

Plaintiffs challenge the two provisions of Senate Bill 2 that direct Defendant to spend tax dollars to support magistrates who claim personal religious objections to marriages between citizens and taxpayers of the same sex—to spend funds to bring in a "willing" magistrate to perform these constitutionally protected marriages in McDowell County; and to pay into the retirement system to bridge the gap in service for those magistrates who had quit office rather than comply with this Court's marriage ruling, but then were reappointed after Senate Bill 2 became law. Plaintiffs claim that this spending, ordered by Senate Bill 2 and administered by Defendant, uses public funds to further a religious belief in violation of the First Amendment.

The justiciable injury that provides Plaintiff standing is "the very 'extract[ion] and spen[ding]' of 'tax money' in aid of religion alleged by a plaintiff." *Arizona Christian School*

10

*Tuition Org. v. Winn*, 563 U.S. 125, 140 (2011). In *Winn*, a 5-4 majority found no standing to contest a $50 million state tax credit for religious school scholarships because it did not involve any spending of taxes. In so holding, the Court reiterated the core holding of *Flast*:

> [G]overnment should not "'force a citizen to contribute three pence only of his property for the support of any one establishment.'" This Madisonian prohibition does not depend on the amount of property conscripted for sectarian ends. Any such taking, even one amounting to "three pence only," violates conscience.

*Id.* at 141. Plaintiffs bring that "Madisonian" claim: that Senate Bill 2 forces them to contribute taxes to support an expressly and exclusively religious purpose. A review of taxpayer standing jurisprudence that led to *Flast,* and how it has evolved since, shows that Plaintiffs have standing to challenge the spending "conscripted for sectarian ends" by Senate Bill 2.

The *Flast* Court reversed its 45-year-old decision in *Frothingham v. Mellon*, 262 U.S. 447 (1923). It reviewed the confused law on local, state, and federal taxpayer standing and undertook a lengthy analysis of the meaning of "justiciability" under Article III. 392 U.S. at 91-101. The Court concluded that "question of standing is related only to whether the party invoking federal court jurisdiction has 'a personal stake in the outcome of the controversy.'" *Id.* at 101. It found such a personal stake could exist in certain taxpayer cases and that *Frothingham* was "no absolute bar" to such suits. The Court found two related conditions necessary for a federal taxpayer claim: a challenge only to Congressional spending under Article 1, § 8, the tax and spend clause; and only a challenge that the spending was limited by some other specific constitutional provision. *Id.* at 102-03. The challenge in *Flast* met both prongs. The taxpayers challenged spending approved under Art. 1, § 8; and the spending was subject to the limits imposed by the First Amendment.

> James Madison, who is generally recognized as the leading architect of the religion clauses of the First Amendment, observed in his famous Memorial and Remonstrance Against Religious Assessments that 'the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may

force him to conform to any other establishment in all cases whatsoever.' The concern of Madison and his supporters was quite clearly that religious liberty ultimately would be the victim if government could employ its taxing and spending powers to aid one religion over another or to aid religion in general. The Establishment Clause was designed as a specific bulwark against such potential abuses of governmental power, and that clause of the First Amendment operates as a specific constitutional limitation upon the exercise by Congress of the taxing and spending power conferred by Art. I, s 8.

*Id.* at 104 (internal citation omitted)

*Flast* led to a series of challenges to public spending for religious purposes with varying results on the merits, but none finding lack of standing to bring the action. *See Walz v. Tax Comm'n of City of New York,* 397 U.S. 664 (1970) (upholding the constitutionality of property tax exemptions for religious organizations); *Lemon v. Kurtzman*, 403 U.S. 602 (1971) (disallowing state funding to parochial schools); *Hunt v. McNair,* 413 U.S. 734 (1973) (permitting a state agency to issue tax-exempt bonds to sectarian institutions); *Committee for Public Ed. & Religious Liberty v. Nyquist,* 413 U.S. 756 (1973) (striking down maintenance grants and state tax deduction for tuition paid at religious schools); *Mueller v. Allen,* 463 U.S. 388 (1983) (upholding state tax deductions for expenses incurred in attending religious schools). The Supreme Court also summarily affirmed lower court decisions adjudicating taxpayer challenges to spending on First Amendment grounds, all of them finding standing to bring the claim.[3]

The most prominent of the religious spending cases was *Lemon*, out of which developed a three-part test for determining a First Amendment violation. Notably, *Lemon* was one of many First Amendment challenges to *state* spending by *state* taxpayers. It involved taxpayer

---

[3] *See Byrne v. Public Funds for Public Schools of N.J.,* 442 U.S. 907 (1979), *summarily aff'g* 590 F.2d 514, 516, n. 3 (3d Cir. 1979) (holding that "plaintiffs, as taxpayers, have standing under *Flast*" to challenge a tax deduction for dependents attending religious and other private schools); *Grit v. Wolman,* 413 U.S. 901 (1973), *summarily aff'g Kosydar v. Wolman,* 353 F.Supp. 744, 749 (S.D. Ohio 1972) (three-judge court) (noting that no party had questioned the standing of taxpayers to contest tax credits for private-school tuition payments); *Franchise Tax Bd. of Cal. v. United Ams. for Public Schools,* 419 U.S. 890 (1974*), summarily aff'g* No. C–73–0090 (N.D. Cal. Feb. 1, 1974) (three-judge court) (invalidating a tax credit for children attending private schools).

challenges to state-funded school programs that benefited parochial schools. The plaintiffs, like here, were state taxpayers challenging state spending. *Id.* at 608 ("Appellees are citizens and taxpayers of Rhode Island"); *id.* at 611, ("individual plaintiffs-appellants are citizens and taxpayers of Pennsylvania.").

Fourteen years after *Lemon*, the Court again found state taxpayer standing against two state-funded education programs. *See School Dist. of City of Grand Rapids v. Ball*, 473 U.S. 373 (1985), *overruled on other grounds by Agostini v. Felton*, 521 U.S. 203 (1997). The Court rejected a challenge to the plaintiffs' standing and listed "the numerous cases in which we have adjudicated Establishment Clause challenges *by state taxpayers* to programs for aiding nonpublic schools." 473 at 380 n.5 (listing Supreme Court decisions about First Amendment limitations on *state* spending) (emphasis added). In short, Defendant errs by claiming the *Flast* standing applies only to challenges to federal spending.

In contrast to this case where the taxpayers challenge specific state spending provision, the Supreme Court has found that plaintiffs lacked standing because they had not challenged a specific legislative appropriation under the tax and spend clause. These lawsuits generally involve a challenge to discretionary spending by an executive agency independent of any legislative action. *See, e.g., Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 228 (1974) (anti-war group had no standing under *Flast* because "respondents did not challenge an enactment under Art. I, § 8, but rather the action of the Executive Branch"); *United States v. Richardson*, 418 U.S. 166, 173-174 (1974) (no standing because the suit did not allege any specific constitutional limit on the Article I, § 8 powers, precisely the type of generalized grievance that is not cognizable under *Flast* and *Frothingham*)*; Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464 (1982) (no standing in

First Amendment challenge to federal agency's donation of property to a religious college); *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587 (2007). The Court also rejected standing in cases challenging state tax incentives in *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006), where Ohio taxpayers challenged state and city tax incentives awarded to a car manufacturer to induce it remain in Toledo. The Court found that the Madison "three pence" statement of principles did not apply on those facts and found that the plaintiffs lacked standing. *Id.* at 332.

The "specific evils feared" from use of the "extraction and spending" power, even if only "three pence," to favor a religion was the particular "injury" that established standing in *Flast* then shaped the Court's last decision in *Winn*. As discussed *supra*, the Court found the plaintiffs lacked standing for an Establishment Clause challenge to an Arizona law that provided state tax credits for donations to a "student tuition organization" that, in turn, provided scholarships to students to attend private and religious schools. 563 U.S. at 136. The Court found no standing for challenge to a tax *credit* program because it did not involve the "extract[ion] and spend[ing]" of taxes—but was instead just a tax credit. The *Winn* majority stated that *Flast* standing did *not* turn on the amount of money involved, but on the fact of actual taxation and spending, even if miniscule and again cited to the Madison "three pence" rule.

> *Flast* thus "understood the 'injury' alleged in Establishment Clause challenges to federal spending to be the very 'extract[ion] and spen[ding]' of 'tax money' in aid of religion alleged by a plaintiff." *DaimlerChrysler*. "Such an injury," *Flast* continued, is unlike "generalized grievances about the conduct of government" and so is "appropriate for judicial redress."

563 U.S. at 140 (internal citation omitted).

This lawsuit fits squarely within *Flast* and *Winn* to provide standing for Plaintiffs challenge to the "extraction and spending of tax money in aid of religion." The legislature ordered the expenditure of tax funds to provide financial support—bridging service credit—to those magistrates who, on religious grounds, resigned in opposition to this Court's marriage

ruling and then were reappointed when Senate Bill 2 allowed them to avoid performing such marriages; and to pay to helicopter in a magistrate to any county where all magistrates refused to marry gay citizens. Plaintiffs, as taxpayers, challenge the spending of tax dollars authorized and required by Senate Bill 2; and they claim the First Amendment limits the Legislature's ability to tax and spend in this manner. They have standing to bring that claim under *Flast* and *Winn.*

### B.    Plaintiffs Have Standing Under the Fourteenth Amendment.

Plaintiffs' standing to assert their claims under the Equal Protection and Due Process Clauses, likewise, arises under *Flast*. 392 US at 105-06 ("we hold that a taxpayer will have standing consistent with Article III to invoke federal judicial power when he alleges that congressional action under the taxing and spending clause is in derogation of those constitutional provisions which operate to restrict the exercise of the taxing and spending power"). As taxpayers, Plaintiffs assert that the expenditure of taxpayer funds is limited by the Fourteenth Amendment, which operates to restrict the exercise of the State's taxing and spending power when used to disavow a judicial oath to support and uphold the due process and equal protection rights of a group of citizens. The transportation of oath-abiding magistrates to perform constitutionally protected statutory duties and allow magistrates who reject their oath to remain in office not only advances a single religious view against the constitutionally-protected right to marry, but it also it rejects that Fourteenth Amendment protection.

The requirement that all judges uphold and support the full constitutional rights of all citizens is precisely the type of "specific limitation" under *Flast* that "operate[s] to restrict the exercise of the taxing and spending power." 392 U.S. at 105-06. The holding in *Flast* that it is not limited to Establishment Clause limits on spending has never been rejected. Indeed, as noted,

the cases cited above that reject the *Flast* taxpayer standing did not involve challenges to a legislature's authority to tax and spend.

### C. Plaintiffs Also Have Prudential Standing.

Defendant Warren also asserts that Plaintiffs lack prudential standing to challenge Senate Bill 2. [DE 39 at 19-20] While Defendant argues Plaintiffs' grievances must be tempered by "[c]onsiderations of federalism" and merely invoke notions of "abstract questions that amount to generalized grievances," he ignores the crux the Plaintiffs' lawsuit: that when the government spends money for religious purposes a taxpayer's injury is serious and concrete enough to be "judicially cognizable." *Allen v. Wright*, 468 U.S. 737, 752 (1984) (citing *Flast*, 392 U.S. 83). Unlike in the cases cited by Defendant, Plaintiffs have sufficiently established the causation and redressability prongs and linked the injuries—for example, expenditure of state funds for religious purposes—to the challenged law.

### III. PLAINTIFFS' COMPLAINT SUFFICIENTLY STATES A CLAIM.

### A. Plaintiffs' Complaint Sufficiently States a Claim for Violations of the First Amendment to the United States Constitution.

Defendant erroneously asserts that Plaintiffs' claims consist of mere "legal conclusions and factual deductions regarding the possible impact of Senate Bill 2." [DE 39 at 29] Plaintiffs have pled sufficient facts to a state a claim under the First Amendment that Senate Bill 2 is a prohibited spending of tax funds for an express and primary religious purpose. [DE 1 ¶¶ 77-80]

*Lemon v. Kurtzman* provides that a statute must satisfy three tests to avoid First Amendment problems:

> First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster 'an excessive government entanglement with religion.'

16

403 U.S. at 612-13 (1971) (internal citations omitted). *See also Estate of Thornton v. Caldor, Inc.,* 472 U.S. 703, 708, (1985). The Complaint alleges that Senate Bill 2 fails each of the three tests at the pleading stage.

Senate Bill 2 has an expressly religious purpose by title.

**A BILL TO BE ENTITLED AN ACT TO ALLOW MAGISTRATES AND REGISTERS OF DEEDS TO RECUSE THEMSELVES FROM PERFORMING DUTIES RELATED TO MARRIAGE CEREMONIES DUE TO SINCERELY HELD RELIGIOUS OBJECTION.**

Passed in direct response to this Court's marriage equality ruling, the law's titular purpose is to provide magistrates with a "sincerely held religious objection" an exemption from performing civil marriages. The principle effect of the law is to give that religious view against gay marriage preeminence over the judicial oath to support and uphold the constitution. The law entangles government in religion by providing a religious exemption from the Article VI judicial oath that obliges every magistrate to support and uphold the constitution. Further, the Complaint alleges that the legislature failed to perform any balancing of interests when passing the law, and, by injecting "sincerely" in the law, opened the question of whether a magistrate's religious belief is truly genuine.

Those allegations make out a claim a First Amendment claim. Defendant's argument that the law is a religious accommodation that "fits within the corridor between the Religion Clauses" is a fact-intensive defense to a facially invalid statute. *Thornton,* for example involved religious accommodation—a law allowing employees to take their chosen Sabbath off from work. The Supreme Court found that "accommodation" violated the First Amendment. 472 U.S. at 708. Thus, Plaintiffs have stated a First Amendment claim.

**B.    Plaintiffs' Complaint Sufficiently States a Claim for Violations of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.**

Defendant also moves to dismiss Plaintiffs' Fourteenth Amendment claims for failure to state a claim.[4] Defendant misstates the obvious: the state is spending tax money pursuant to Senate Bill 2 to allow magistrates to recuse themselves from performing all marriages *only because* gay and lesbian citizens like Plaintiffs Penn and Goodman seek to exercise their fundamental right to marry. [DE 1 ¶¶ 75-76]

"[I]f a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end" *Heller v. Doe*, 509 U.S. 312, 319-20 (1993). Under *Heller*, Senate Bill 2 violates the Equal Protection Clause in two respects. First, the motive behind Senate Bill 2—animus against gay citizens and rejection of this Court's order compelling recognition of the fundamental right to marry—is not a legitimate state interest. Second, the opt-out provision harms Plaintiffs and burdens the exercise of the fundamental right to marry in that it stigmatizes same-sex couples with the knowledge that the State does not "believe as a matter of publicly sanctioned and financed religious creed that gays and lesbians are not entitled to the full rights of other citizens." [DE 1 ¶ 104]

That the opt-out provision at issue in this case *never existed* before this Court declared the fundamental right of same-sex couples to marry or earlier opinions that magistrates must perform the duties of their office illuminates the motive of Senate Bill 2. The legislation systematically empowers magistrates to invoke religion to avoid their judicial oath of office to

---

[4] Defendants argue that Senate Bill 2 does not single out "[g]ay or lesbian citizens like Plaintiffs," [DE 1 ¶ 104], but rather simply allows magistrates to recuse themselves from performing all marriages. Because that law does not target a particular class of individuals, there exist no Equal Protection concerns. Even if Senate Bill 2 classified along the lines of the purported class of citizens, such classifications neither involve a fundamental right nor create a suspect class of individuals, and is strongly presumed to be constitutionally valid. *North Dakota v. United States*, 495 U.S. 423, 433 (1990)." [DE 39 at 29]

uphold the federal constitution. It did so in indignant reaction to this Court finding a substantive due process right to marry. [DE 1 ¶ 58]

Defendant seeks to avoid the basic premise of Plaintiffs' claim: that the impermissible motive behind Senate Bill 2—relieving magistrates of their oath of office out of continued animus toward gay and lesbian citizens—is an illegitimate state interest which renders the statute unconstitutional under the Fourteenth Amendment. [DE 1 ¶ 107] "[D]iscriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision." *Romer*, 517 U.S. 620, 633 (1996) (citing *Louisville Gas & Elec. Co. v. Coleman*, 277 U.S. 32, 37-38 (1928)) A law whose "sheer breadth is so discontinuous with the reasons offered for it that [it] seems inexplicable by anything but animus towards the class it affects." *Id.* at 632.

It is settled law that animus against gays and lesbians is an unconstitutional policymaking motive. *Romer*, 517 U.S. 620; *United States v. Windsor*, 133 S.Ct. 2675 (2013); *Obergefell v. Hodges*, 135 S.Ct. 2584 (2015). A government "may not avoid the strictures of [the Equal Protection Clause] by deferring to the wishes or objections of some fraction of the body politic." *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 448 (1985). More specifically, anti-gay prejudice as a policymaking motive has been found unconstitutional with respect to the exercise of the fundamental right to marry. *See*, *e.g., United States v. Windsor*, 133 S.Ct. 2675 (2013); *Obergefell v. Hodges*, 135 S.Ct. 2584 (2015).

In *Windsor*, the Supreme Court found that the federal government's "unusual deviation from the usual tradition" of recognizing state definitions of marriage belied its "bare congressional desire to harm a politically unpopular group." *Windsor*, 133 S.Ct. at 2693 (citing *Moreno*, 413 U.S. 528, 534-35). "This is strong evidence of a law having the purpose and effect

of disapproval of that class." *Id.* The Court concluded that "no legitimate purpose overcomes the purpose and effect to disparage and injure" rights exercised by same-sex couples. *Id.* at 2696.

Senate Bill 2 similarly reflects an "unusual deviation from the usual tradition" of magistrates performing the judicial function of solemnizing marriages in North Carolina, pursuant to N.C.G.S. §§ 7A-292(b)(9), 51-1, 51-7. The codification of a law to allow judges to reject their oath of judicial office, passed in direct reaction to this Court's decision, is not only "unusual," it is unprecedented in North Carolina law.

In overturning the state constitutional amendment at issue in *Romer*, the Court noted the competing interests advanced by the state in defense of the law; namely, the religious objections of employers and landlords, as well as respect for other citizens' freedom of associations. The Court noted, "It is a status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests." *Id.* at 635. Here, Senate Bill 2 applies to magistrates <u>not</u> in their capacity as private citizens holding religious beliefs, but in their *official* capacities as judges and agents of the state. A magistrate acting pursuant to N.C.G.S. §§ 7A-292(b)(9), 51-1, 51-7 *is* the state. Senate Bill 2 is not an example of an employer attempting to accommodate the religious practices of an employee. *See EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S.Ct. 2028 (2015). Rather, the State is allowing its judges to disavow the federal constitution out of personal religious animus toward the law.

It beggars belief that the State would defend a statute permitting the following: (a) election officials to opt-out of counting ballots because they hold a religious objection to women exercising the right to vote; (b) a magistrate to refuse to set bonds for persons charged with a DWI because of his or her religious views against consumption of alcohol: (c) a magistrate to opt-out of issuing arrest warrants on domestic violence offenses because of his or her religious

20

views requiring a wife to submit to her husband; (d) magistrates to opt-out of presiding over small claims actions for money owed because of his or her religious views against usury; or (e), as in the case of Plaintiffs Carol and Thomas Person, a magistrate to refuse to perform a marriage because of a religious view against interracial marriage. [DE 1 ¶ 2] The conclusion is obvious, and the vehicle for reaching it is clear: the Equal Protection Clause is violated where a statute is enacted and enforced pursuant to an illegitimate state interest.

Plaintiffs' Complaint amply alleges sufficient facts in support of its claim for a violation of the Equal Protection Clause to survive Defendants' Rule 12(b)(6) motion. Plaintiffs allege specific facts concerning the motive behind the recusal of 32 magistrates; namely, moral disapproval of marriages between people of the same sex, which Supreme Court jurisprudence amply recognizes fails rational basis review. [DE 1 ¶¶ 74-77] In relevant part, Plaintiffs specifically allege: "At its bottom, Senate Bill 2 singles out gay and lesbian couples, and rejects with malice and animus the fundamental right and equal dignity of marriage for gays and lesbians protected under the Fourteenth Amendment by the U.S. Supreme Court, as held in *Obergefell v. Hodges*, 135 S.Ct. 2584 (2015), and protects and supports magistrates who deny gay and lesbians citizens equal treatment under the law, including Plaintiffs Ansley, McGaughey, Penn, and Goodman." [DE 1 ¶ 107]

All Plaintiffs share in the stigmatic harm associated with the State of North Carolina expressing moral disapproval of their exercise of a fundamental right. Whether the establishment of state-sanctioned religion is a legitimate state interest is a legal question on the basis of the facts adduced herein at trial or summary judgment. However, the Complaint states a cognizable legal claim.

**C.** **Plaintiffs' Complaint Sufficiently States a Claim for Violations of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.**

The law in support of Plaintiffs' Fourteenth Amendment claims for violations of equal protection of the laws and due process overlaps. However, Plaintiffs bring these claims as distinct causes of action because magistrates are uniquely positioned as judicial officials with the power and authority given to them by law to—quite literally—grant or deny due process of law. As Professor Michael Cromwell at the University of North Carolina stated in an email to Judicial Chief District Court Judges on October 14, 2014:

> A magistrate has taken an oath of office to perform the duties of his office and, just like you [District Court Judges], does not get to choose which laws to follow and which not … This is an issue about which people have strong opinions, and magistrates no doubt are divided just as other citizens are. The difference is that magistrates have taken an oath of office and are public officers . . . The judicial system could not work if individual officers acted otherwise . . . [Magistrates], like you, are judicial officials. They should be proud of the public trust that has been placed in them, in the importance of their office, and the need to sustain the rule of law regardless of the discomfort it causes. In the end the one thing that should make them proudest is being judicial.

[DE 1 ¶¶ 44-46]

The right of access to the courts is fundamental. *See, e.g., Bounds v. Smith*, 430 U.S. 817, 828 (1977) (finding that North Carolina failed to provide adequate law libraries to prisoners). Discrimination among people as to access to the courts is subjected to strict scrutiny. *See Griffin v. Illinois*, 351 U.S. 12, 18 (1956) (holding that "at all stages of the proceedings the Due Process and Equal Protection Clauses protect [poor] persons like petitioners from invidious discriminations"). "The public right of access has two dimensions. First, the right protects the public's ability to oversee and monitor the workings of the Judicial Branch … Second, public access to the courts promotes the institutional integrity of the Judicial Branch." *Co. Doe v. Pub. Citizen*, 749 F.3d 246 (4th Cir. 2014) (citations omitted) (addressing the right of public access to

records). Specifically concerning the fundamental right of gay Americans to exercise the right to marry, it was the Due Process Clause contained in the Fifth Amendment upon which the U.S. Supreme Court relied in repealing the Defense of Marriage Act. *Windsor*, 133 S.Ct. at 2695.

In *Tennessee v. Lane*, the Supreme Court clarified that the right of access to the courts prohibits "irrational disability discrimination" under the Due Process Clause of the Fourteenth Amendment. 541 U.S. 509, 522 (2004). In *Lane*, the Court found that many individuals were excluded from courthouses and court proceedings by reason of their disabilities. By denying accommodations to individuals with disabilities, the Court found that the "meaningful right of access to the courts" was denied. *Lane*, 541 U.S. at 532-33. Senate Bill 2 seeks to exclude gay and lesbian citizens from accessing their duly appointed magistrate for the purposes of exercising their fundamental right to marry and impairs the institutional integrity Plaintiffs have in their judicial branch. As in *Lane*, Plaintiffs are denied a meaningful right of access to magistrates who, by law, perform and solemnize their exercise of a fundamental right.

Plaintiffs allege in their complaint that "Senate Bill 2 compromises, impairs, and violates the constitutional integrity of the judicial system. Gay or lesbian citizens, like Plaintiffs Ansley, McGaughey, Penn, and Goodman, may have to appear in other civil or criminal proceedings before magistrates who believe as a matter of publicly sanctioned religious creed that gays and lesbians are not entitled to the full rights of other citizens." [DE 1 ¶ 113] In these other proceedings, these same magistrates who deny the full constitutional rights of Plaintiffs are empowered to adjudicate matters of significant importance. [DE 1 ¶ 115] The State, by and through Senate Bill 2, sends the message to Plaintiffs that deliberately compromises, impairs, and violates the constitutional integrity of their judicial system. [DE 1 ¶ 113] Pursuant to Claim III, Plaintiffs allege a violation of the very "meaningful right of access to the courts" protected

by *Lane* and its progeny. Accordingly, Plaintiffs allege sufficient facts in support of their claim for a violation of due process.

## IV.   VENUE IS PROPER IN THE WESTERN DISTRICT OF NORTH CAROLINA.

Defendant's final argument is that the lawsuit should be dismissed for improper venue or at least transferred to the Eastern District where the AOC is located. This argument skirts the obvious basis for venue under 28 U.S.C. § 1391(b)(2): that the Western District is where "a substantial part of the events … giving rise to the claim occurred." The Complaint lays out that Senate Bill 2 was passed in specific response to this Court's marriage equality ruling, issued in this District, and that the First Amendment and Fourteenth Amendment violations have uniquely played out in McDowell County. All of the magistrates in that county have recused themselves from performing marriages, despite their judicial oath to uphold and protect the constitution. And Defendant is carrying out the provisions of Senate Bill 2 in response to those actions. Given those allegations, venue is proper in the Western District under 28 U.S.C. § 1391(b)(2).

The Complaint also alleges that magistrates located within the Western District resigned in the face of this Court's marriage order, were then reappointed under Senate Bill 2, and Defendant directed payment of tax funds into their retirement system accounts to bridge the gap in service.  Those events also occurred in the Western District.

Changes in the venue statute in 1990 provided for venue in a district where substantial acts or omissions occurred, regardless of the residence of the defendant. As the Fourth Circuit explained in *Mitrano v. Hawes,* 377 F.3d 402, 405 (4th Cir. 2004):

> Congress amended the statute because the prior language "led to wasteful litigation whenever several different forums were involved in the transactions leading up to the dispute." *Cottman Transmission Sys., Inc. v. Martino,* 36 F.3d 291, 294 (3d Cir.1994) (citing Rep. of the Fed. Cts. Study Comm. 94 (Comm. Print 1990)). Under the amended statute, it is possible for venue to be proper in more than one judicial district.

377 F.3d at 405. Defendant's argument is unavailing as it relies heavily on pre-1990 cases to insist that venue is only proper in a district where a government official resides.[5] The only post-1990 case Defendant cites is *Crenshaw v. Syed*, 686 F. Supp. 2d 234 (W.D.N.Y. 2010), where a *pro se* prisoner filed a § 1983 claim for medical malpractice. The prison doctors worked and the alleged malpractice occurred at prisons in the Northern District of New York. Since none of the events occurred in the Western District of New York, venue was deemed improper there. *Id.*

The issue under the *current* statute is whether there has been substantial activity in this District, even though Senate Bill 2 was passed in Raleigh and Defendant is based there.[6] Defendant fails to note that his own research holds that the most important "substantial activity" consideration for determining venue in a First Amendment case is the place of impact:

> In a case brought on First Amendment grounds, impact becomes the most important part of the case. Minimizing the impact of the statute, compared to its adoption or administration, would marginalize the Plaintiff's substantive First Amendment claims under the guise of a venue statute.

*Kalman v. Cortes*, 646 F. Supp. 2d 738, 742 (E.D. Pa. 2009). [DE 39 at 33][7]

## CONCLUSION

Plaintiffs respectfully ask the Court to deny Defendant's Motion to Dismiss.

---

[5] Defendant Warrant relies on the following pre 1990 cases: *Stroud v. Benson*, 254 F.2d 448 (4th Cir. 1958); *Hartke v. Federal Aviation Administration*, 369 F.Supp. 741 (E.D.N.Y. 1973); *Clegg v. U.S. Treasury Dep't*, 70 F.R.D. 486 (D. Mass. 1976); *Birnbaum v. Blum*, 546 F. Supp. 1363 (S.D.N.Y. 1982); *O'Neill v. Battisti*, 472 F.2d 789 (6th Cir. 1972). [DE 39 at 23-24]

[6] Substantial activities may occur in other districts without disqualifying this district as a proper venue, so long as "substantial" activities occurred in this district also. *Hardee's Food Sys. Inc., v. Beardmore*, 169 F.R.D. 311, 316 (E.D.N.C. 1996). Indeed, even if more substantial or the most substantial activities took place elsewhere, this district would not be disqualified. *Id. RED BULL GMBH v. RLED, LLC*, 515 F. Supp. 2d 641, 646 (M.D.N.C. 2007).

[7] Plaintiffs note that the venue question here is similar to the one this Court decided in *Brody v. N. Carolina State Bd. of Elections*, No. 3:10CV383, 2011 WL 1843199, at *5 (W.D.N.C. May 16, 2011), *aff'd on other grounds*, 458 F. App'x 231 (4th Cir. 2011), where it found a sufficient allegation of substantial activity within the Western District although some of the challenged actions had also occurred in the Eastern District. A copy of that decision is attached hereto.

Date: May 31, 2016                    Respectfully submitted,

/s/ S. Luke Largess
N.C. Bar 17486
llargess@tinfulton.com

/s/ Jacob H. Sussman
N.C. Bar No. 31821
jsussman@tinfulton.com

/s/ John W. Gresham
N.C. Bar No. 6647
jgresham@tinfulton.com

TIN FULTON WALKER & OWEN, PLLC
301 East Park Avenue
Charlotte, NC 28203
Tel: 704-338-1220
Fax: 704-338-1312

/s/ Katherine Lewis Parker
N.C. Bar No. 36263
kparker@tinfulton.com

TIN FULTON WALKER & OWEN, PLLC
1213 Culbreth Drive
Wilmington, NC 28405
Tel: 910-228-5200
Fax: 910-401-1155

/s/ Meghann Burke
N.C. Bar No. 42209
meghann@brazilburkelaw.com

BRAZIL & BURKE, P.A.
77 Central Avenue, Suite E
Asheville, NC 28801
Tel: 828-350-3812
Fax: 828-258-8972

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing paper with the Clerk of Court by using the CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the CM/ECF system.

Date: May 31, 2016                                    **/s/ Jacob H. Sussman**