UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
DOCKET NO. 1:16-cv-00054-MOC-DLH

| | | |
|---|---|---|
| **KAY DIANE ANSLEY, et al.,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| Vs. | ) | **ORDER** |
| | ) | |
| **MARION WARREN,** in his Official Capacity as Director of the North Carolina Administrative Office of the Courts, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

THIS MATTER is before the court on the Motion to Dismiss (#38) by Defendant, which has been fully briefed and is ripe for review. The court heard oral arguments on the Motion on August 8, 2016. Defendant argues that this matter should be dismissed for lack of jurisdiction, improper venue, and Plaintiffs' failure to state a claim upon which relief can be granted. Having considered the Motion, the arguments of counsel, and the applicable law, the court enters the following findings, conclusions, and Order.

## FINDINGS AND CONCLUSIONS

### I. INTRODUCTION

The facts as alleged in this case are as follows. See Complaint (#1) at ¶¶ 18-85. In September 2011, the North Carolina legislature voted to hold a statewide ballot initiative, commonly called Amendment One, to amend the North Carolina Constitution to limit marriage to opposite-sex couples and prohibit the recognition of marriages between same-sex couples. The Amendment One referendum passed on May 10, 2012, amending the state constitution. On Friday, October 10, 2014, after the Supreme Court denied certiorari in Bostic v. Schaefer, 760 F.3d 352

-1-

(4th Cir. 2014), this court declared Amendment One, and its corollary provisions in Chapter 51 of the General Statutes, unconstitutional. This court found that the ban on marriage between same-sex couples violated the Fourteenth Amendment under the Fourth Circuit's decision in <u>Bostic</u>. <u>See Gen. Synod of the United Church of Christ v. Resinger</u>, 12 F. Supp. 3d 790, 791 (W.D.N.C. 2014).

Following this Court's ruling in <u>General Synod</u>, thousands of marriage licenses were issued to same-sex couples in North Carolina, and those couples were subsequently married, some through ceremonies performed by magistrates. On Monday, October 13, 2014, Defendant Warren's predecessor as director of the Administrative Office of the Courts, Judge John W. Smith, issued a directive instructing state magistrates to immediately conduct marriages of all couples presenting a marriage license issued by the Register of Deeds. On Tuesday, October 14, 2014, General Counsel for the North Carolina Administrative Office of the Courts ("NCAOC") issued a legal memorandum stating that magistrates would violate their judicial oath to uphold the United States Constitution if they refused to marry same-sex couples. Also on October 14, 2014, the District Court for the Middle District of North Carolina issued an Order and Judgment also striking down Amendment One and corollary marriage laws prohibiting marriage equality. <u>See Fisher-Borne v. Smith</u>, 14 F. Supp. 3d 695, 698 (M.D.N.C. 2014). On October 24, 2014, various members of the North Carolina General Assembly, including Phil Berger, President Pro Tempore of the Senate, sent a letter to the Director of the NCAOC, voicing their criticisms of NCAOC's directives concerning the October 14 memorandum. The objecting members of the General Assembly "encourage[d] [the NCAOC] to revise the memorandum to include a comprehensive and correct statement of federal and state law on the doctrine of reasonable accommodation and management flexibility." Plaintiffs have alleged that some magistrates, including magistrates from counties

-2-

within this judicial district, resigned in the face of this court's Order in <u>General Synod</u> and the directive from the NCAOC rather than uphold their oath of office and perform marriages for same-sex couples.[1]

On January 28, 2015, the President Pro Tempore of the Senate filed the second bill of the new legislative session, Sess. Law 2015-75, Senate Bill 2, "An Act To Allow Magistrates And Registers Of Deeds To Recuse Themselves From Performing Duties Related To Marriage Ceremonies Due To Sincerely Held Religious Objection") (hereinafter "Senate Bill 2" or S.B. 2). Section 1 of the proposed bill created a new statute, N.C.Gen.Stat. § 51-5.5, that would grant magistrates the right to recuse themselves from conducting any marriages, and separately would grant assistant and deputy registers of deeds the right to recuse themselves from issuing marriage licenses, for six-month intervals, based upon "any sincerely held religious belief." <u>See</u> N.C.Gen.Stat. § 51-5.5. Plaintiffs have alleged that, given the timing of the law's enactment, the legislature acted in direct response to this court's ruling in <u>General Synod</u> to exempt magistrates who oppose same-sex marriages from fulfilling their mandatory judicial oath to support and uphold the United States Constitution. Section 2 of S.B. 2 amended N.C.Gen.Stat. § 14-230, which provides, <u>inter alia</u>, that any magistrate who should "willfully omit, neglect or refuse to discharge any of the duties of his office… shall be guilty of a Class 1 misdemeanor." S.B. 2 added subsection

---

1 Under subchapters IV and VI of Chapter 7A of North Carolina's General Statutes, magistrates are judicial officials who preside over certain matters in North Carolina's State District Courts. Those matters include solemnizing marriages and signing marriage licenses and submitting them for registration in accordance with North Carolina law. <u>See</u> N.C.GEN.STAT. § 7A-292(b)(9); § 51-1; § 51-7. Under N.C.GEN.STAT. § 7A-170, magistrates are required to take the judicial oath of office, consisting of the oath of all public officials set out in N.C.GEN.STAT. § 11-7, and the specific oath for judges found in N.C.GEN.STAT. § 11-11. Under N.C.GEN.STAT. § 14-230, any magistrate who violates the oath of office or willfully refuses to discharge a duty of office is subject to removal from office on a misdemeanor charge.

-3-

(b) to N.C.Gen.Stat. § 14-230, providing that "[n]o magistrate recusing in accordance with G.S. 51-5.5 may be charged under this section for recusal to perform marriages in accordance with Chapter 51 of the General Statutes." Senate Bill 2 thus expressly excludes a magistrate's refusal to perform marriage ceremonies as an act that "violated his oath of office" or that constituted a form of "misbehavior in office" or otherwise provided cause for removal from office on a Class 1 misdemeanor. Section 3 of S.B. 2 amended N.C.Gen.Stat. § 161-27, which provides penalties for a register of deeds who fails to perform his legal duties, to add a subsection (b), which expressly protects assistant and deputy registers of deeds from being charged with a Class 1 misdemeanor for "recusal to issue marriage licenses in accordance with Chapter 51 of the General Statutes." Section 4 of S.B. 2 added the following provision to N.C.Gen.Stat. § 7A-292, which lists the "additional powers of magistrates": "The authority granted to magistrates under G.S. 51-1 and subdivision (a)(9) of this section is a responsibility given collectively to the magistrates in a county and is not a duty imposed upon each individual magistrate. The chief district court judge shall ensure that marriages before a magistrate are available to be performed at least a total of 10 hours per week, over at least three business days per week." Under Section 5 of S.B. 2, "Any magistrate who resigned, or was terminated from, his or her office between October 6, 2014, and the effective date of this act may apply to fill any vacant position of magistrate." Such magistrates were not allowed to receive a salary or earn leave during that time, but would be "considered to have been serving as a magistrate during that period for purposes of determining continuous service, length of aggregate service, anniversary date, longevity pay rate, and the accrual of vacation and sick leave." Additionally, Section 5 of S.B. 2 provides that the "Judicial Department shall pay and submit both the employee and employer contributions to the Retirement Systems Division on

-4-

behalf of the magistrate as though that magistrate had been in active service during the period in question."

Plaintiffs have alleged that S.B. 2 also authorizes the expenditure of public funds to accomplish the goal of exempting magistrates from their oath of office on religious grounds in two ways. First, language in N.C.Gen.Stat. § 51-5.5 provides that if all of the magistrates in a given county recuse themselves due to a "sincerely held religious objection" from performing marriages, the NCAOC will arrange to bring a willing magistrate from another county to perform marriages. Second, under Section 5 of S.B. 2, any magistrate who had resigned his or her position, and then applied and was reappointed to that position within 90 days of the effective date of S.B. 2, would receive full credit towards retirement for that gap in service. To accomplish that end, Section 5 of S.B. 2 requires the "Judicial Department" to pay into the state retirement system on behalf of each reappointed magistrate both the employee's and employer's share of retirement contributions to cover that gap in service.

The House approved S.B. 2 on May 28, 2015. Governor McCrory vetoed it that same day, issuing a formal statement explaining the reason for his veto. That statement provided:

> I recognize that for many North Carolinians, including myself, opinions on same-sex marriage come from sincerely held religious beliefs that marriage is between a man and a woman. However, we are a nation and a state of laws. Whether it is the president, governor, mayor, a law enforcement officer, or magistrate, no public official who voluntarily swears to support and defend the Constitution and to discharge all duties of their office should be exempt from upholding that oath; therefore, I veto Senate Bill 2.

See "Governor's Objections and Veto Message."[2] The legislature overrode the Governor's veto on June 11, 2015. On June 26, 2015, the U.S. Supreme Court ruled in Obergefell v. Hodges, 576

---

2 Available at: http://www.ncleg.net/Sessions/2015/S2Veto/S2Veto.html.

U.S. ___, 135 S. Ct. 2584 (2015), that state bans on marriage between same-sex couples violated both the Equal Protection and Due Process clauses of the Fourteenth Amendment. The North Carolina legislature did not seek to modify S.B. 2 in the wake of the Supreme Court's decision in Obergefell.

Plaintiffs have alleged that since S.B. 2 became law, at least 32 magistrates across North Carolina who had previously performed marriages for opposite-sex couples invoked religious beliefs to recuse themselves from performing marriages because of their opposition to performing marriages for same-sex couples. They have also alleged that all of the magistrates in McDowell County recused themselves from performing marriages under S.B. 2 because of their opposition to marriage equality for same-sex couples. They have further alleged that Defendant Warren, in his Official Capacity as Director of the NCAOC, has expended public funds monthly under N.C.Gen.Stat. § 51-5.5(c) to further this religious exemption from the oath of office for all of McDowell County's magistrates by paying from public funds the costs necessary to transport magistrates from Rutherford County to perform marriages in McDowell County, and to transport magistrates from McDowell County to Rutherford County to perform other judicial duties during that time.

The court finds it noteworthy that recusing magistrates are not required to publicly state whether they have recused themselves from performing marriages. Plaintiffs allege that Defendant Warren knows that gay and lesbian citizens of McDowell County may need to appear before oath-renouncing magistrates in other civil or criminal matters, and that every magistrate in McDowell County believes that gay and lesbian citizens should not be entitled to full Equal Protection and Due Process of law under the Fourteenth Amendment, which is now the law of this country under

-6-

Obergefell. While a citizen appearing before a magistrate in McDowell County will know of a magistrate's recusal status by virtue of the fact that they have all recused themselves, the secrecy of recusal presents an issue in other counties where some magistrates have recused and some have not.

The plaintiffs in this case are three couples. Plaintiffs Kay Diane Ansley and Catherine "Cathy" McGaughey are citizens and residents of McDowell County, North Carolina, who were married on October 14, 2014, after this court's ruling in General Synod. Plaintiffs Carol Ann Person and Thomas Roger Person are citizens and residents of Moore County, North Carolina. They are an interracial couple who attempted to get married in 1976, and two magistrates in Forsyth County refused to marry them because of religious objections to interracial marriage. In 1978, a federal district court found that the two magistrates had violated the Fourteenth Amendment rights of Carol Ann and Thomas, ordered that their marriage be performed and ordered the magistrates to pay the Persons' legal fees. Plaintiffs Kelley Penn and Sonja Goodman are citizens and residents of Swain County, North Carolina, who are engaged to be married. Defendant Marion Warren is Director of the NCAOC, which manages and oversees the administrative services provided to the Judicial Branch of North Carolina's more than 6,000 employees and hundreds of courthouses and facilities in every county of the state.

Plaintiffs brought this action under 42 U.S.C. § 1983 challenging the constitutionality of S.B. 2 on three grounds—under the Establishment Clause of the First Amendment, and the Equal Protection and Due Process clauses of the Fourteenth Amendment. Plaintiffs seek a declaratory judgment providing: 1) that Defendant Warren's spending in furtherance of the goals of S.B. 2 violates Article VI of the U.S. Constitution (the Supremacy Clause) as well as the First

Amendment, as applied to North Carolina under the Fourteenth Amendment; 2) that Defendant Warren cannot support and protect magistrates who disavow their judicial oath and duties on religious grounds; 3) that Defendant Warren's use of public funds to advance a specific religious view of marriage equality is unconstitutional; and 4) that Defendant Warren's actions in furtherance of S.B. 2 violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Plaintiffs also seek an Order enjoining Defendant Warren from taking further action to implement S.B. 2, including the expenditure of public funds and the provision of administrative support to magistrates who have recused themselves from performing marriages. <u>See</u> Complaint (#1) at pp. 23-24. Within ten days of the filing of the lawsuit, a number of individuals moved to intervene in this case pursuant to Rule 24 of the Federal Rules of Civil Procedure. Those Motions were ultimately denied on August 12, 2016. <u>See</u> (#61).

## II.   MOTION TO DISMISS

Defendant has moved to dismiss Plaintiffs' Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), (2), (3), and (6). Defendant argues that this matter should be dismissed for lack of personal and subject matter jurisdiction, improper venue, and Plaintiffs' failure to state a claim upon which relief can be granted. The court will address each argument in turn.

### A.   Personal Jurisdiction

In support of the motion to dismiss, Defendant Warren first argues that this court lacks personal jurisdiction over him, acting in his official capacity, because Plaintiffs have failed to allege that he has actually taken, or threatened to take, any action to deny them of their asserted rights as taxpayers, or as same-sex couples who wish to be married by a magistrate. Defendant Warren argues that, absent allegations that he enforced the subject statutes as amended by S.B. 2,

Plaintiffs' claims under 42 U.S.C. § 1983 should be dismissed pursuant to Rules 12(b)(2) and (6) of the Federal Rules of Civil Procedure.

"When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff ultimately bears the burden of proving to the district court judge the existence of jurisdiction over the defendant by a preponderance of the evidence." Combs v. Bakker, 886 F.2d 673, 676 (4th Cir.1989). "[W]hen, as here, the court addresses the question [of personal jurisdiction] on the basis only of motion papers, supporting legal memoranda and the relevant allegations of a complaint, the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis to survive the jurisdictional challenge." New Wellington Fin. Corp. v. Flagship Resort Dev. Corp., 416 F.3d 290, 294 (4th Cir. 2005).

Here, Plaintiff has filed suit pursuant to 42 U.S.C. § 1983 challenging Defendant Warren's actions, acting under the color of state law, as in violation of the First and Fourteenth Amendments. The parties dispute the applicability of the Ex parte Young doctrine to Defendant in this case. The Eleventh Amendment prohibits federal courts from exercising jurisdiction over suits asserted against a state by its own citizens or by citizens of another state. U.S. Const. amend. XI; Hans v. Louisiana, 134 U.S. 1, 18 (1890). The Eleventh Amendment also prohibits states from being sued in state court without their consent. Alden v. Maine, 527 U.S. 706, 712 (1999). "The ultimate guarantee of the Eleventh Amendment is that non-consenting States may not be sued by private individuals in federal court." Bd. of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 363 (2001). However, under the doctrine articulated in Ex parte Young, 209 U.S. 123 (1908), an exception to Eleventh Amendment immunity exists wherein a federal court may "issue prospective, injunctive relief against a state officer to prevent ongoing violations of federal law, on the rationale that such

-9-

a suit is not a suit against the state for purposes of the Eleventh Amendment." McBurney v. Cuccinelli, 616 F.3d 393, 399 (4th Cir. 2010) (citing Ex parte Young, 209 U.S. at 159–60).

The Supreme Court has explained the Ex parte Young doctrine as follows:

> To ensure the enforcement of federal law…the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. This standard allows courts to order prospective relief, as well as measures ancillary to appropriate prospective relief[.] Federal courts may not award retrospective relief, for instance, money damages or its equivalent, if the State invokes its immunity.

Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 437 (2004) (citations omitted). As the Fourth Circuit has explained, "Ex parte Young requires a 'special relation' between the state officer sued and the challenged statute to avoid the Eleventh Amendment's bar. General authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law." Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d 316, 331 (4th Cir. 2001) (citations omitted) (finding that although the named governor "is under a general duty to enforce the laws of Virginia by virtue of his position as the top official of the state's executive branch, he lacks a specific duty to enforce the challenged statutes….The purpose of allowing suit against state officials to enjoin their enforcement of an unconstitutional statute is not aided by enjoining the actions of a state official not directly involved in enforcing the subject statute.").

Here, Plaintiffs allege that Defendant Warren, in his official capacity, is sued for "conduct taken under color of state law that violates the First and Fourteenth Amendments," see Complaint at ¶ 4, in that he has undertaken "unconstitutional spending" in defiance of this Court's Order in General Synod. Defendant argues that Plaintiffs have made no factual allegation that Defendant has taken, or threatened, any action to enforce S.B. 2 or to defy this Court's Order in General Synod. Defendant therefore argues that he lacks the required "special relation" to the alleged

-10-

violation of federal law. See Ex parte Young, 209 U.S. at 157; Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d at 331. The Fourth Circuit has explained the "special relation" test as follows:

> Where a state law is challenged as unconstitutional, a defendant must have "some connection with the enforcement of the act" in order to properly be a party to the suit. This "special relation" requirement ensures that the appropriate party is before the federal court, so as not to interfere with the lawful discretion of state officials. Primarily, the requirement has been a bar to injunctive actions where the relationship between the state official sought to be enjoined and the enforcement of the state statute is significantly attenuated. Such cases have been dismissed on the ground that "[g]eneral authority to enforce the laws of the state" is an insufficient ground for abrogating Eleventh Amendment immunity. Thus, the [state actor defendant's] connection to the [alleged unlawful activity] need not be _qualitatively_ special; rather, "special relation" under Ex parte Young has served as a measure of _proximity to_ and _responsibility for_ the challenged state action. This requirement ensures that a federal injunction will be effective with respect to the underlying claim.

S. Carolina Wildlife Fed'n v. Limehouse, 549 F.3d 324, 332–33 (4th Cir. 2008) (emphasis in original). The "special-relation requirement protects a state's Eleventh Amendment immunity while, at the same time, ensuring that, in the event a plaintiff sues a state official in his individual capacity to enjoin unconstitutional action, [any] federal injunction will be effective with respect to the underlying claim." McBurney v. Cuccinelli, 616 F.3d 393, 399 (4th Cir. 2010) (citation and internal quotation marks omitted). The parties agree that in considering whether a defendant has sufficient enforcement powers to fall under the Ex parte Young exception, the Fourth Circuit will look at the duties enumerated by statute. See id. at 400 (parsing the statutory duties of the attorney general and finding he lacked authority to enjoin violations of the Virginia Freedom of Information Act).

Defendant argues that by virtue of North Carolina's General Statutes and the State's Constitution, he is not empowered to enforce S.B. 2. N.C.Gen.Stat. § 7A-340 establishes "a State office to be known as the Administrative Office of the Courts. It shall be supervised by a Director,

Case 1:16-cv-00054-MOC-DLH   Document 67   Filed 09/20/16   Page 11 of 38

assisted by an assistant director." In turn, N.C.Gen.Stat. § 7A-341 provides that the "Director shall be appointed by the Chief Justice of the Supreme Court, to serve at the pleasure of the Chief Justice." The Director's duties are set out with N.C.Gen.Stat. § 7A-343, which include administrative duties such as compiling data associated with financial operations; prescribing efficient business methods; performing audits and making recommendations to ensure the efficiency and efficacy of the Judicial Branch; making arrangements for the physical facilities and equipment of the Judicial Branch; analyzing and entering into vendor contracts; making arrangements for the payment of interpreters and experts; issuing photographic identification cards to appropriate Judicial personnel; and, establishing appropriate per-mile reimbursement for transportation by privately owned vehicles in accordance with rates set out by the Internal Revenue Service. Those duties also include: "ensur[ing] overall compliance with federal and State laws"; determining the number of "magistrates required for the efficient administration of justice"; overseeing an Internal Audit Division that "evaluates and discloses potential weaknesses in the effectiveness of internal controls in the court system for the purpose of safeguarding public funds and assets and minimizing incidences of fraud, waste, and abuse"; "inspect[ing] and review[ing] the effectiveness and efficiency of processes and proceedings conducted by judicial officers;" and "prepar[ing] and submit[ting] budget estimates of State appropriations necessary for the maintenance and operation of the Judicial Department, and authoriz[ing] expenditures from funds appropriated for these purposes." N.C.Gen.Stat. § 7A-343.

Defendant contends that none of the duties delegated by N.C.Gen.Stat. § 7A-146 provide the Director the responsibility or authority to enforce any law, much less S.B. 2, but only authorizes him to engage in those specific administrative activities designed to facilitate the administration

-12-

of justice. Plaintiffs argue that Defendant Warren is an appropriate defendant in this case because S.B. 2 directs him, "as Director of the NCAOC … to use public funds for a religious purpose," see Complaint at ¶ 4, and that "Defendant Warren oversees and manages the administration of the judicial system and is well aware that magistrates are judicial officials subject to these provisions of law as well as the judicial oath of office." Id. at ¶ 28.

Plaintiffs argue that Defendant Warren is an appropriate defendant under Limehouse. In that case, the Fourth Circuit found that a state transportation agency director, who had supervisory authority over South Carolina's drafting of an environmental impact statement for a federally funded bridge project, satisfied the proximity and responsibility requirements. The director argued that the "special relation" condition was not met because he was not "charged with any duty under a federal statute or … with enforcement of a state statute." The Fourth Circuit rejected this argument, finding:

> As the administrative head of the agency with responsibility for carrying out its policies and representing the agency in its dealings with the federal government, the Director possesses a sufficient connection to the alleged violation of federal law.

Limehouse, 549 F.3d at 333. Plaintiffs here argue, similarly, that Defendant Warren is responsible for the expenditure of taxpayer funds to operate the court system, and is the administrative head of the agency responsible for administering and implementing S.B. 2, which directs the NCAOC director to spend public funds as part of his statutory duties under N.C.Gen.Stat. § 51-5.5. Plaintiffs contend that Defendant Warren's spending has enabled all of the McDowell County magistrates to recuse themselves from their marriage duties under S.B. 2. See Complaint at ¶¶ 63-65. Plaintiffs thus contend that the proximity and responsibility prongs under Limehouse are both met.

-13-

Plaintiffs also note that the Fourth Circuit applied <u>Ex parte Young</u> to find jurisdiction over a similar defendant in <u>Bostic v. Schaefer</u>, the case that established the binding precedent for this court's ruling in <u>General Synod</u>. 760 F.3d 352, 371 (4th Cir. 2014), <u>cert. denied</u>, 135 S. Ct. 308 (2014), <u>cert. denied sub nom</u>. <u>McQuigg v. Bostic</u>, 135 S. Ct. 314 (2014). The Circuit found in <u>Bostic</u> that Defendant Rainey—the Registrar of Vital Records for Virginia—whose administrative duties included developing Virginia's marriage license application form and distributing it to the circuit court clerk, played a sufficient role in the marriage process to make her an appropriate defendant. <u>Bostic</u>, 760 F.3d at 371. The Fourth Circuit also found that the Clerk of Circuit Court for the City of Norfolk, who was responsible for issuing individual marriage licenses and filing records of marriage in the localities in which they serve, was a proper defendant. <u>Id.</u> at 371 n.3 ("Schaefer bears the requisite connection to the enforcement of the Virginia Marriage Laws due to his role in granting and denying applications for marriage licenses"). One of this court's colleagues within the Fourth Circuit reached the same conclusion in <u>Harris v. McDonnell</u>, 988 F. Supp. 2d 603, 609 (W.D. Va. 2013) regarding the Registrar of Vital Records, whose job requirements as delineated by statute included the duty to file records of marriage and "furnish forms for the marriage license, marriage certificate, and application for marriage license used in the Commonwealth." <u>See</u> <u>id.</u> ("The Virginia Governor has insufficient proximity to and responsibility for Virginia's marriage laws, and plaintiffs have not shown any involvement by the Governor in the enforcement of these laws. In contrast, Rainey, the State Registrar of Vital Records, has such proximity and responsibility and is a proper party defendant in this case.").[3]

---

3 Defendant notes that the parties in <u>Harris</u> had agreed that Rainey was a proper defendant, which is not the case here. However, the court still finds the court's analysis instructive. The <u>Harris</u> court noted that the State Defendants recognize Rainey's statutory authority as the State

-14-

Having considered the matter, the court concludes that Defendant Warren is a proper Defendant because his duties are sufficiently connected to the alleged violation of federal law to constitute the requisite "special relation" under the Ex Parte Young doctrine. As in Limehouse, Defendant has "supervisory control" over the action challenged here—the preparation of budget estimates for the required state funds to operate the judicial department and authorization of expenditures of those funds. Also as in Limehouse, Defendant Warren is "the administrative head of the agency with responsibility for carrying out its policies." The fact that Defendant Warren, in his official capacity, is the official tasked with financial responsibilities relating to the operation of the Judicial Department makes him an appropriate official for suit. The court therefore finds that Defendant's argument as to lack of personal jurisdiction is without merit.

## B.    Venue

Defendant next argues that venue is improper in the Western District of North Carolina and that this matter should be dismissed pursuant to Fed. R. Civ. P. 12(b)(3). Ordinarily, proper venue for actions filed in federal district courts is governed by 28 U.S.C. § 1391, which provides that:

> A civil action may be brought in—
>
> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
> (2) a judicial district in which a substantial part of the events or omissions

Registrant of Vital Records regarding Virginia marriage law and policy. See id. (citing Va. Code Ann. § 32.1–267(A), (E) (duty to file record of marriage and "furnish forms for the marriage license, marriage certificate, and application for marriage license used in the Commonwealth"); id. § 32.1–252 (outlining generally the duties of the State Registrar); id. § 32.1–268, –268.1, – 271, –275 (regarding the reporting of data by the State Registrar on marriage, divorce, and annulment rates); id. § 32.1–272 (State Registrar's authority to issue certified and other copies of vital records)).

giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b). When venue is improper under § 1391, the district court must dismiss the action or, "if it be in the interest of justice," transfer the action "to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). "When an objection to venue has been raised under Rule 12(b)(3), the burden lies with the plaintiff to establish that venue is proper in the judicial district in which the plaintiff has brought the action." Turfworthy, LLC v. Dr. Karl Wetekam & Co. KG, 26 F. Supp. 3d 496, 502 (M.D.N.C. 2014) (citations omitted). "Courts decide questions of venue largely on the basis of the pleadings.... The Court is not obliged, however, to treat all allegations as true, no matter how speculative, conclusory, or lacking of necessary supporting factual allegations. Instead... a complaint must allege a factual basis for its legal claims." Bartko v. Wheeler, No. 1:13CV1006, 2014 WL 29441, at *8 (M.D.N.C. Jan. 3, 2014) (citation omitted). In considering a motion to dismiss under Rule 12(b)(3) for improper venue, "the court is permitted to consider evidence outside the pleadings. A plaintiff is obliged, however, to make only a prima facie showing of proper venue in order to survive a motion to dismiss. In assessing whether there has been a prima facie venue showing, we view the facts in the light most favorable to the plaintiff." Aggarao v. MOL Ship Mgmt. Co., 675 F.3d 355, 365–66 (4th Cir. 2012). As an alternative to dismissal, Defendant has moved to transfer this case to the Eastern District of North Carolina pursuant to 28 U.S.C. § 1404, though he makes no argument under the requisite factors for transfer.[4]

---

4  28 U.S.C. § 1404(a) provides: "For the convenience of parties and witnesses, in the interest of

Under the plain language of 28 U.S.C. § 1391, venue may be proper in two or more judicial districts. See Mitrano v. Hawes, 377 F.3d 402, 405 (4th Cir. 2004). "[I]n determining whether events or omissions are sufficiently substantial to support venue under the amended statute, a court should not focus only on those matters that are in dispute or that directly led to the filing of the action. Rather, it should review "the entire sequence of events underlying the claim." Id. While venue might be proper in more than one district, courts still must consider the word "substantial." Bartko, 2014 WL 29441, at *8 (citing Gulf Ins. Co. v. Glasbrenner, 417 F.3d 353, 356–57 (2d Cir.

---

justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." Id. Upon a motion to transfer, the moving party carries a heavy burden. Duke Energy Florida, Inc. v. Westinghouse Elec. Co., No. 3:14-CV-00141-MOC, 2014 WL 2572960, at *5 (W.D.N.C. June 9, 2014). A court's decision to grant a motion to transfer venue under 28 U.S.C. § 1404(a) is largely discretionary. 3A Composites USA, Inc. v. United Indus., Inc., No. 5:13CV83-RLV, 2014 WL 1471075, at *1 (W.D.N.C. Apr. 15, 2014). In exercising such discretion, the court applies a balancing test and considers various factors in deciding whether transfer is appropriate. Jim Crockett Promotions, Inc. v. Action Media Grp., Inc., 751 F.Supp. 93 (W.D.N.C. 1990). The factors to be considered include:

    1. The plaintiff's initial choice of forum;
    2. The residence of the parties;
    3. The relative ease of access of proof;
    4. The availability of compulsory process for attendance of witnesses and the costs of obtaining attendance of willing witnesses;
    5. The possibility of a view by the jury;
    6. The enforceability of a judgment, if obtained;
    7. The relative advantages and obstacles to a fair trial;
    8. Other practical problems that make a trial easy, expeditious, and inexpensive;
    9. The administrative difficulties of court congestion;
    10. The interest in having localized controversies settled at home and the appropriateness in having the trial of a diversity case in a forum that is at home with state law that must govern the action; and
    11. The avoidance of unnecessary problems with conflict of laws.

Id. A motion should not be granted if transfer "would merely shift the inconvenience from the defendant to the plaintiff, or if the equities lean but slightly in favor of the movant after all factors are considered." Id. at 95.

-17-

2005); Jenkins Brick Co. v. Bremer, 321 F.3d 1366, 1371 (11th Cir. 2003); Cottman v. Transmission Sys., Inc. v. Martino, 36 F.3d 291, 294 (3d Cir. 1994)). "That means for venue to be proper, significant events or omissions material to the plaintiff's claim must have occurred in the district in question, even if other material events occurred elsewhere. It would be error, for instance, to treat the venue statute's 'substantial part' test as mirroring the minimum contacts test employed in personal jurisdiction inquiries." Id. (citations omitted).

Defendant argues that venue is improper in the Western District of North Carolina because the appropriate venue for this case is the Eastern District, which is where Defendant resides in his official capacity and where he contends the substantial events (debates and enactment of the challenged law) occurred. Plaintiffs do not contest that venue would be proper in the Eastern District given Defendant's "official residence" there. See, e.g., Crenshaw v. Syed, 686 F. Supp. 2d 234, 237 (W.D.N.Y. 2010) ("For the purposes of venue, state officers 'reside' in the district where they perform their official duties") (citations omitted); Stanton-Negley Drug Co. v. Pennsylvania Dep't of Pub. Welfare, No. CIV.A. 07-1309, 2008 WL 1881894, at *4 (W.D. Pa. Apr. 24, 2008) ("It is well established that, 'for purposes of venue a state official's residence is located at the state capitol, even where branch offices of the state official's department are maintained in other parts of the state.'") (citing Leroy v. Great W. United Corp., 443 U.S. 173 (1979)). Nonetheless, Plaintiffs argue that a substantial part of the events triggering this lawsuit occurred in this district. Plaintiffs argue that the Complaint lays out that S.B. 2 was passed in response to this court's ruling in General Synod, and that the alleged First Amendment and Fourteenth Amendment violations have uniquely played out in McDowell County. All of the magistrates in that county have recused themselves from performing marriages and Defendant is carrying out the provisions of S.B. 2 in

-18-

response to those actions. Further, Plaintiffs note that the Complaint alleges that magistrates located within the Western District resigned in the face of this court's Order in General Synod, were then allowed to be reappointed under S.B. 2, and Defendant directed payment of tax funds into their retirement system accounts to bridge the gap in service.

Several courts apply the principle that "where plaintiffs challenge state-wide policies, and not merely the actions of state officials in a single county, venue is proper pursuant to Section 1391(b)(2) in the district where those policies are developed." Chester v. Beard, No. CIV.A. 07-4742, 2008 WL 2310946, at *8 (E.D. Pa. June 2, 2008). Other courts apply the venue statute more broadly. See, e.g., Cent. Valley Chrysler-Jeep, Inc. v. Witherspoon, No. CV-F-04-6663 REC, 2005 WL 2709508, at *6 (E.D. Cal. Oct. 20, 2005) ("In cases involving state officials, a substantial connection to the claim occurs not only where the 'triggering event' takes place, but also where the effects of the decision are felt.") (citing McClure v. Manchin, 301 F.Supp.2d 564, 569 (N.D. W. Va. 2003) (rejecting secretary of state's claim that a state election law challenge must be brought in the district where the state government sits); Emison v. Catalano, 951 F. Supp. 714, 721 (E.D. Pa. 1996) (suits challenging official acts may be brought in the district where the effects of the challenged statute are brought despite being enacted elsewhere)). See also Bay Cnty. Democratic Party v. Land, 340 F. Supp. 2d 802, 806 (E.D. Mich. 2004) (finding that because the effects of the challenged election ballot procedure were felt statewide, venue was appropriate outside the district where state government was seated).

Here, while a substantial part of the events giving rise to this lawsuit occurred in Raleigh, the court finds that venue is indeed proper in this district based on the specific allegations in the Complaint made as to the magistrates in McDowell County and based on Plaintiffs' residency

-19-

here. The court also recognizes that some deference is due to Plaintiff's choice of forum where venue is appropriate there. See Brody v. N. Carolina State Bd. of Elections, No. 3:10CV383, 2011 WL 1843199, at *5 (W.D.N.C. May 16, 2011), aff'd on other grounds, 458 F. App'x 231 (4th Cir. 2011) ("although Defendants do not seek a discretionary transfer of venue under 28 U.S.C. § 1404(a), Plaintiffs' choice of forum is due some deference since venue is, in fact, proper in the selected forum."); comScore, Inc. v. Integral Ad Sci., Inc., 924 F. Supp. 2d 677, 682 (E.D. Va. 2013) ("The plaintiff's choice of forum is typically entitled to substantial weight, especially where the chosen forum is the plaintiff's home or bears a substantial relation to the cause of action.") (citation and internal quotation marks omitted). As such, the court will not dismiss this case on the basis of venue.

## C.    Standing

Defendant next argues that Plaintiffs lack standing and that this court therefore lacks subject matter jurisdiction over their claims. "There exist two strands of standing: Article III standing, which ensures that a suit presents a case or controversy as required by the Constitution, and prudential standing, which encompasses judicially self-imposed limits on the exercise of federal jurisdiction." Doe v. Virginia Dep't of State Police, 713 F.3d 745, 753 (4th Cir. 2013) (internal citations and quotation marks omitted).

Article III of the Constitution constrains federal courts to resolve only actual cases and controversies. U.S. Const. art. III, § 2, cl. 1. Because of this constitutional limitation, Plaintiffs must demonstrate they have standing to adjudicate their claim in federal courts. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102 (1998). "A court does not have subject matter jurisdiction over an individual who does not have standing." AtlantiGas Corp. v. Columbia Gas

-20-

Transmission Corp., 210 Fed. Appx. 244, 247 (4th Cir. 2006). Rule 12(b)(1) provides for dismissal of claims against all defendants where the court lacks jurisdiction over the subject matter of the lawsuit. Mansfield, C. & L.M.R. Co. v. Swan, 111 U.S. 379, 382 (1884). The Federal Rules of Civil Procedure provide that "[i] the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3) (emphasis added). A plaintiff must demonstrate standing for each claim asserted. DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 335 (2006).

Standing has three essential elements: injury, causation, and redressability. Marshall v. Meadows, 105 F.3d 904, 906 (4th Cir. 1997). To satisfy the constitutional standing requirement, a plaintiff must provide sufficient evidence to show that: (1) the plaintiff suffered an injury in fact, which is an invasion of a legally protected interest that is concrete and particularized, and actual or imminent, not conjectural or hypothetical; (2) there is a causal connection between the injury and the conduct complained of; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision of the court. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992) (citations and internal quotation marks omitted). These requirements help prevent federal courts from issuing opinions on abstract or hypothetical questions, or from giving advisory opinions. See Fed. Election Comm'n v. Akins, 524 U.S. 11, 20 (1998). Similarly, the requirements of standing maintain "the tripartite allocation of power set forth in the Constitution," Cuno, 547 U.S. at 341, and ensures that the judicial branch's authority to review—and overturn— the decisions of the executive and the legislative branches is employed only "in the last resort, and as a necessity." Allen v. Wright, 468 U.S. 737, 752 (1984).

"At the pleading stage, general factual allegations of injury resulting from the defendant's

conduct may suffice [to satisfy these elements], for on a motion to dismiss [the court] presume[s] that general allegations embrace those specific facts that are necessary to support the claim." Lujan, 504 U.S. at 561 (citations and internal quotation marks omitted). "In determining whether a party has standing to bring suit, the party invoking the jurisdiction of the court bears the burden of establishing standing." Bishop v. Bartlett, 575 F.3d 419, 424 (4th Cir. 2009).

### 1. *Standing as to the First Amendment Claim*

As noted above, "a federal lawsuit must seek to prevent or redress an <u>actual or imminently threatened injury</u> to the plaintiff. Plaintiffs may not establish their standing to bring suit merely because they disagree with a government policy, or because they share the generalized interest of all citizens in constitutional governance[.]" Moss v. Spartanburg Cnty. Sch. Dist. Seven, 683 F.3d 599, 604–05 (4th Cir. 2012) (internal citations and quotation marks omitted) (emphasis added). To satisfy the "injury in fact" requirement, plaintiffs must allege they "have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Winn, 131 S.Ct. at 1442 (quotations omitted). While determining the existence of an injury is not typically a particularly difficult task for a federal court, "[i]t has been repeatedly noted that 'the concept of injury for standing purposes is particularly elusive in Establishment Clause cases.'" Suhre v. Haywood Cnty., 131 F.3d 1083, 1085 (4th Cir. 1997) (quoting Murray v. City of Austin, 947 F.2d 147, 151 (5th Cir. 1991)). "[T]he Establishment Clause plaintiff is not likely to suffer physical injury or pecuniary loss. Rather, the spiritual, value-laden beliefs of the plaintiffs are often most directly affected by an alleged establishment of religion. Accordingly, rules of standing recognize that noneconomic or intangible injury may suffice to make an Establishment Clause claim justiciable." Suhre, 131 F.3d at 1086

Case 1:16-cv-00054-MOC-DLH   Document 67   Filed 09/20/16   Page 22 of 38

(internal citations and quotation marks omitted). The Fourth Circuit has explained that while "standing principles must be tailored to reflect the kind of injuries Establishment Clause plaintiffs are likely to suffer…[the courts] must guard against efforts to use this principle to derive standing from the bare fact of disagreement with a government policy, even passionate disagreement premised on Establishment Clause principles. Such disagreement, taken alone, is not sufficient to prove spiritual injury." Moss, 683 F.3d at 605–06 (internal citations and quotation marks omitted) (emphasis added). See also Awad v. Ziriax, 670 F.3d 1111, 1122 (10th Cir. 2012) ("it is not enough for litigants to claim a constitutional violation. They must also 'identify a[ ] personal injury suffered by them as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees.'") (quoting Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 485 (1982)) (emphasis in original). Nonetheless, "[t]he party who invokes the [court's] power must be able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as a result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally." Doremus v. Bd. of Ed. of Borough of Hawthorne, 342 U.S. 429, 434 (1952).

The Supreme Court has noted that standing based on an Establishment Clause claim can be premised on several theories. "Some plaintiffs may demonstrate standing based on the direct harm of what is claimed to be an establishment of religion, such as a mandatory prayer in a public school classroom." Arizona Christian Sch. Tuition Org. v. Winn, 563 U.S. 125, 129–30 (2011) (internal citations omitted). "Other plaintiffs may demonstrate standing on the ground that they have incurred a cost or been denied a benefit on account of their religion. Those costs and benefits

-23-

can result from alleged discrimination in the tax code, such as when the availability of a tax exemption is conditioned on religious affiliation." Id. Such challenges are brought under the rule set forth in Flast v. Cohen, 392 U.S. 83 (1968), which is what Plaintiffs seek to do in this case. See also Altman v. Bedford Cent. Sch. Dist., 245 F.3d 49, 72 (2d Cir. 2001) ("standing to assert an Establishment Clause claim may rest either on the plaintiff's direct exposure to the challenged activity…[e.g.] students attending a public school, and their parents, have standing to challenge a program of Bible reading in the school because they are directly affected by the laws and practices against which their complaints are directed[], or, in certain situations, on the plaintiff's status as a taxpayer.") (citing 392 U.S. at 103–04; Doremus, 342 U.S. at 433–35)) (internal quotation marks and alterations omitted). Here, Plaintiffs allege that the justiciable injury providing them standing is "the very 'extract[ion] and spen[ding]' of 'tax money' in aid of religion alleged by a plaintiff." (Pl. Mem. Opp. Mot. Dismiss (#46) (citing Winn, 563 U.S. at 140)). See also Pl. Complaint at ¶ 6 ("Plaintiffs have standing as state taxpayers under Flast v. Cohen, 392 U.S. 83 (1968) and its progeny, as they challenge the spending of tax funds by Defendant Warren as approved by the state legislature for the express and primary religious purpose in violation of the First Amendment.").

    *a. Taxpayer Standing*

Plaintiffs alleged in their Complaint and reiterated at oral argument that they base standing in this suit solely on their status as taxpayers under Flast v. Cohen, 392 U.S. 83 (1968), and not any other "actual or imminently threatened injury" that they seek to redress. Summers v. Earth Island Inst., 555 U.S. 488, 492 (2009). Plaintiffs have alleged an Establishment Clause violation as to the expenditure of government funds in order to facilitate the recusal of magistrates from

marriage ceremonies. Their argument that their tax dollars are not being used in a constitutional manner is simply not enough to confer standing. It may be that, in Establishment Clause cases such as this, an allegation that state funds are being spent to further a religious belief <u>should</u> be sufficient to confer standing. However, a finding of standing in such a case is not supported by current precedent.

Generally, the payment of taxes is not enough to establish standing to challenge the legality of an action taken by the government. <u>See Hein v. Freedom From Religion Found., Inc.</u>, 551 U.S. 587, 593 (2007) ("if every federal taxpayer could sue to challenge any Government expenditure, the federal courts would cease to function as courts of law and would be cast in the role of general complaint bureaus."). "Such suits are typically foreclosed because the harm is too widely shared, the financial injury to any given taxpayer is too slight, and the possibility of redress is too speculative to support standing under traditional principles." <u>Freedom From Religion Found., Inc. v. Lew</u>, 773 F.3d 815, 820 (7th Cir. 2014) (citing <u>Winn</u>, 563 U.S. at 133).

The Supreme Court in <u>Flast</u> recognized a narrow exception to the general rule against federal taxpayer standing, holding that "a plaintiff asserting an Establishment Clause claim has standing to challenge a law authorizing the use of federal funds in a way that allegedly violates the Establishment Clause." <u>Hein</u>, 551 U.S. at 593. The Court has reiterated time and again that "<u>Flast</u>'s holding provides a 'narrow exception' to 'the general rule against taxpayer standing.'" <u>Winn</u>, 563 U.S. at 138 (quoting <u>Bowen v. Kendrick</u>, 487 U.S. 589, 618 (1988)).

In <u>Flast</u>, the plaintiff asserted an Establishment Clause claim to the disbursement of funds to religious schools, and cited taxpayer status as the sole basis for standing. <u>Flast</u>, 392 U.S. at 85-86. As the Supreme Court later noted in <u>Hein</u>, "[t]he expenditures at issue in <u>Flast</u> were made

pursuant to an express congressional mandate and a specific congressional appropriation. The plaintiff in that case challenged disbursements made under the Elementary and Secondary Education Act of 1965, 79 Stat. 27 [, which] expressly appropriated the sum of $100 million for fiscal year 1966, and authorized the disbursement of those funds to local educational agencies for the education of low-income students." Hein, 551 U.S. at 603 (citing Flast, 392 U.S. at 86). The expenditures challenged in Flast were "funded by a specific congressional appropriation and were disbursed to private schools (including religiously affiliated schools) pursuant to a direct and unambiguous congressional mandate." Id. (citing Flast, 392 U.S. at 90).

In Flast, the Supreme Court held that taxpayers have standing when two conditions are met. First, "the taxpayer must establish a logical link between that status and the type of legislative enactment attacked." Flast, 392 U.S. at 102, ibid. ("[t]hus, a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, s 8, of the Constitution."). Significant to the factual circumstances of this case, "[i]t will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute." Id. Second, "the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged. Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, § 8." Id.

The Court found that the plaintiffs in Flast satisfied the first condition by challenging a congressional spending statute adopted pursuant to Article I, § 8, of the United States Constitution,

-26-

and satisfied the second condition by alleging that the disbursements violated the Establishment Clause, which "operates as a specific constitutional limitation upon the exercise by Congress of the taxing and spending power conferred by Art. I, [§] 8." Id. at 103-04.

In Flast, the Court discussed the roots of the Establishment Clause, noting that "[o]ur history vividly illustrates that one of the specific evils feared by those who drafted the Establishment Clause and fought for its adoption was that the taxing and spending power would be used to favor one religion over another or to support religion in general." Id. at 103. They explained that "James Madison, who is generally recognized as the leading architect of the religion clauses of the First Amendment, observed in his famous Memorial and Remonstrance Against Religious Assessments that 'the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever.'" Id. at 103–04 (quoting 2 Writings of James Madison 183, 186 (Hunt ed. 1901)). "The Establishment Clause was designed as a specific bulwark against such potential abuses of governmental power, and that clause of the First Amendment operates as a specific constitutional limitation upon the exercise by Congress of the taxing and spending power conferred by Art. I, § 8." Id. at 104.

In Winn, the Supreme Court summarized, "[Flast] explain[ed] that individuals suffer a particular injury for standing purposes when, in violation of the Establishment Clause and by means of 'the taxing and spending power,' their property is transferred through the Government's Treasury to a sectarian entity." Winn, 563 U.S. at 139–40 (2011). "As Flast put it: 'The taxpayer's allegation in such cases would be that his tax money is being extracted and spent in violation of specific constitutional protections against such abuses of legislative power.'" Id. (quoting Flast,

392 U.S. at 106). "Flast thus understood the injury alleged in Establishment Clause challenges to federal spending to be the very extract[ion] and spen[ding] of tax money in aid of religion alleged by a plaintiff." Id. (citing Cuno, 547 U.S. at 348; Flast, 392 U.S. at 106 (quotation marks omitted)).

Supreme Court jurisprudence since Flast has found limitations to the Flast exception based on various types of government expenditures, albeit not without generating some confusion as to the doctrine's precise applicability. See Am. Civil Liberties Union of Mass. v. Sebelius, 697 F. Supp. 2d 200, 205 (D. Mass. 2010) (judgment vacated on other grounds) ("Supreme Court cases since Flast discussing taxpayer standing are admittedly confusing."). Nonetheless, since Flast, several clarifications have guided lower court decisions to a certain extent. In Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464 (1982), the Court held that taxpayers did not have standing to challenge the free transfer of surplus federal property to a nonprofit religious school on Establishment Clause grounds. See id. at 479. In refusing standing to the plaintiff taxpayers, the Court noted that "the source of their complaint is not a congressional action, but a decision by [the Secretary of Health, Education, and Welfare] to transfer a parcel of federal property." Id. Because the transfer did not involve an exercise of the congressional spending power under Article I, § 8, but rather one of executive authority under the Property Clause of Article IV, the Court held that it did not fall within the Flast exception. Id. at 480. Thus, the Court has "limited taxpayer standing to challenges directed 'only [at] exercises of congressional power'" under the Taxing and Spending Clause. Hein, 551 U.S. at 604 (citing Valley Forge, 454 U.S. at 479).

In Hein, the taxpayer-plaintiffs asserted an Establishment Clause challenge to executive orders establishing the White House Office of Faith–Based and Community Initiatives within the

Case 1:16-cv-00054-MOC-DLH   Document 67   Filed 09/20/16   Page 28 of 38

Executive Office of the President, as well as similar offices in other federal agencies. Id. at 593–94 (Alito, J., plurality opinion). The Court in Hein focused on the distinction between explicit congressional appropriations and discretionary executive expenditures. In Hein, Congress had not authorized the creation of the offices by legislation; rather, the offices were created by executive orders and funded by "general Executive Branch appropriations." Id. at 595. The Court found that the taxpayer-plaintiffs lacked standing to challenge the executive orders because they had not alleged an "Establishment Clause violation ... funded by a specific congressional appropriation and ... undertaken pursuant to an express congressional mandate." Id. at 604. The challenged "appropriations did not expressly authorize, direct, or even mention the expenditures of which respondents complain"; rather, "[t]hose expenditures resulted from executive discretion, not congressional action." Id. at 604. Because the taxpayer-plaintiffs challenged a disbursement not "funded by a specific congressional appropriation" and not "undertaken pursuant to an express congressional mandate," the Court concluded the taxpayer-plaintiffs lacked standing. Id. See also Murray v. U.S. Dep't of Treasury, 681 F.3d 744, 750 (6th Cir. 2012) ("the Hein Court indicated that a taxpayer-plaintiff had standing to raise an Establishment Clause challenge to an executive branch disbursement only where the statute 'expressly contemplate[s] that some of those moneys might go to projects involving religious groups.'") (quoting Hein, 551 U.S. at 607). Thus, Hein clarifies that taxpayer standing does not extend to a taxpayer challenge to a statute generally providing funding to the executive branch.

Several years later, in Arizona Christian School Tuition Organization v. Winn, the Supreme Court held that taxpayer standing only applies to taxpayer challenges involving specific government appropriations, not tax credits or other "tax expenditures." 563 U.S. at 141. While

Hein and Winn limited the applicability of taxpayer standing, it did not otherwise overturn the basic principles articulated in Flast.

As noted above, Plaintiffs' sole basis for standing is "as state taxpayers under Flast v. Cohen, 392 U.S. 83 (1968) and its progeny." See Complaint at ¶ 6. However, despite citing the two-pronged Flast test in their brief, Plaintiffs fail to make any argument as to how they make the required showing under that test. Plaintiffs explain that they challenge the two provisions of S.B. 2 that direct Defendant to spend tax dollars to support magistrates who claim personal religious objections to marriages between citizens (taxpayers) of the same sex. First, to expend funds to bring in a "willing" magistrate to perform marriages in McDowell County. Second, to pay into the retirement system to bridge the gap in service for those magistrates who resigned after this court's ruling in General Synod, but then were reappointed after S.B. 2 became law. Plaintiffs claim that this spending, ordered by S.B. 2 and administered by Defendant, uses public funds to further a religious belief in violation of the First Amendment. Plaintiffs argue that this lawsuit fits squarely within Flast and Winn to provide standing for their challenge to the state's "extraction and spending of tax money in aid of religion" as authorized and required by S.B. 2 in order to carry out the law's legislative purpose. Plaintiffs contend that even contributing "three pence" of taxpayer dollars to an expressly and exclusively religious purpose affords them standing. See Winn, 563 U.S. at 141.

However, while Plaintiffs' policy arguments are indeed in conformance with the roots of the taxpayer standing doctrine, Winn did not overturn the fundamental, two-part test articulated in Flast, nor has any other case. Having carefully considered the parties' arguments regarding Plaintiffs' standing to bring an Establishment Clause claim in light of the governing law, the court

Case 1:16-cv-00054-MOC-DLH   Document 67   Filed 09/20/16   Page 30 of 38

finds that Plaintiffs have failed to make the required showing that they fall within the Flast

exception to taxpayer standing.[5]

As Defendant notes, Plaintiffs are not challenging a government appropriation, but rather

the spending of taxpayer funds necessary to achieve the goals of the state law. As with all

regulatory statutes, some sort of expense can be expected to accompany the goals of the statute.

As noted above, "the taxpayer must establish a logical link between that status and the type of

legislative enactment attacked" and then "must establish a nexus between that status and the

precise nature of the constitutional infringement alleged." Flast, 392 U.S. at 102. As the Seventh

Circuit has articulately summarized in assessing taxpayer standing jurisprudence, "[t]he plurality

of the Court made clear in Hein that only 'expenditures made pursuant to an express congressional

mandate and a specific congressional appropriation' met the first nexus requirement; the plurality

rejected the plaintiffs' claim that any 'expenditure of government funds in violation of the

Establishment Clause' would meet this requirement." Hinrichs v. Speaker of House of

Representatives of In. Gen. Assembly, 506 F.3d 584, 598 (7th Cir. 2007) (quoting Hein, 127 S.Ct.

at 2565). Here, Plaintiffs have not pointed to the establishment of any specific appropriation of

funds by the legislature to implement the allegedly unconstitutional purpose of S.B. 2. The funding

provisions that Plaintiffs challenge here—travel expenses for magistrates and retirement

contributions—are not "expenditures made pursuant to an express [legislative] mandate and a

specific [legislative] appropriation," Hein, 127 S.Ct. at 2565, but are "incidental expenditure[s] of

---

5 The court also notes that, despite Plaintiffs' assertion that they have standing under Flast and
its progeny, their brief largely cites cases where taxpayer standing has not been found. See Pl.
Brief (#46) at pp. 13-15. While the court does not fault Plaintiffs for failing to provide case law
that does not exist, the dearth of authority cited in support of their argument underscores the lack
of legal precedent that would enable this court to find taxpayer standing.

tax funds in the administration of an essentially regulatory statute," which is not sufficient for the purposes of standing. Flast, 392 U.S. at 102. Plaintiffs have not alleged, as in Flast, that they challenge legislative action taken "under the taxing and spending clause," or offered any other rationale as to how "a logical link between [their] status and the type of ... enactment attacked" is present here. Id. at 102-03. Cf. Arizona Christian Sch. Tuition Org., 563 U.S. at 150 (Kagan, J., dissenting) (noting that the taxpayer plaintiffs "attack[ed] a provision of the Arizona tax code that the legislature enacted pursuant to the State Constitution's taxing and spending clause").

Moreover, the law passed here implicitly authorizes uses of funds by the North Carolina judicial branch, not the legislature. Under Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., taxpayer standing does not extend to such expenditures. In Valley Forge, the Court noted that the taxpayer plaintiffs "[did] not challenge the constitutionality of the [Act] itself, but rather a particular Executive Branch action arguably authorized by the Act." 454 U.S. at 479 n.15. Because "the source of their complaint [was] not a congressional action, but a decision by [the executive branch]," Flast [was] inapplicable as it "limited taxpayer standing to challenges directed 'only [at] exercises of congressional power.'" Id. (quoting Flast at 102) (citing Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 228 (1974) (denying standing because the taxpayer plaintiffs "did not challenge an enactment under Art. I, § 8, but rather the action of the Executive Branch")). The court finds no distinction between the holding in Valley Forge denying standing to an expenditure of the executive branch implicitly authorized by legislation and the court's decision here denying standing to an expenditure authorized by an administrative agency of the judicial branch.

In sum, the court fails to see a "logical link between [Plaintiffs' taxpayer] status and

the…legislative enactment attacked." <u>Flast</u>, 392 U.S. at 102. The expenditures authorized by S.B.

2 to enable the NCAOC to administer the recusal process are incidental at best. Senate Bill 2 "did

not expressly authorize, direct, or even mention the expenditures," <u>Hein</u>, 127 S.Ct. at 2566,

necessary to carry out the program. <u>See</u> N.C.Gen.Stat. § 51-5.5. Plaintiffs allege only an

"'expenditure of government funds in violation of the Establishment Clause,'" which cannot

provide a sufficient basis for standing. <u>Hein</u>, 127 S.Ct. at 2566.[6]

---

[6] To the extent Defendant argues that Plaintiffs may not assert taxpayer standing to challenge a <u>state</u> law, as opposed to a federal one, the court finds such argument to apparently be in error, and moreover, unnecessary to resolution of the issue before it. The Supreme Court has addressed challenges to state laws by state taxpayers without any noted issues for decades. <u>See</u> <u>Doremus</u>, 342 U.S. at 434–35 ("[W]e reiterate what the Court said of a federal statute <u>as equally true when a state Act is assailed</u>....") (emphasis added); <u>DaimlerChrysler Corp.</u>, 547 U.S. at 345 ("[t]he… rationale for rejecting federal taxpayer standing applies with undiminished force to state taxpayers.") (citing <u>Doremus</u>). <u>See also</u> <u>Hinrichs</u>, 506 F.3d at 598 ("state taxpayers are held to the same standing requirements as federal taxpayers. They must establish the requisite nexus between their status and the challenged enactment in order to meet the test articulated in <u>Flast</u>."); <u>Smith v. Jefferson Cty. Bd. of Sch. Comm'rs</u>, 641 F.3d 197, 213 (6th Cir. 2011) (citing <u>Hein v. Freedom From Religion Found., Inc.</u>, 551 U.S. at 600, and noting that it described <u>Doremus</u> as a case involving "a state taxpayer's claim")). <u>See also</u> <u>ASARCO Inc. v. Kadish</u>, 490 U.S. 605, 613-14 (1989) (opinion of Kennedy, J.) ("[W]e have likened state taxpayers to federal taxpayers" for purposes of taxpayer standing[.]").

Here, Defendant "agrees that there have indeed been cases where courts arguably assume State taxpayer standing," but notes that "in none of those cases did the Court analyze State taxpayer standing under <u>Frothingham</u>, [<u>Doremus</u>], or <u>Flast</u> and its progeny." <u>See</u> Def. Reply (#49) at p. 16. <u>See also</u> <u>Am. Civil Liberties Union of Mass.</u>, 697 F. Supp. 2d at 205 (judgment vacated on other grounds) ("It is worth noting that in applying the <u>Flast</u> exception, the Court has never permitted standing where the Spending Clause of Article I was not directly implicated."). Defendant argues that Plaintiffs' request for the court to do so in this case is misplaced and that there is no general rule allowing for litigation to all Establishment Clause challenges by all taxpayers, only <u>sub silentio</u> holdings on the issue. Because the court finds that Plaintiffs lack standing for the other reasons stated herein, which it has done assuming that the <u>Flast</u> analysis applies to the challenged state law here, it will not undertake an analysis of whether dismissal of Plaintiffs' claim merely on the basis that it is made as to a state, not federal, law would also be appropriate in this instance.

-33-

The court also finds that Plaintiffs lack standing by virtue of the fact that their claims are merely generalized grievances with a state law with which they disagree, which cannot confer standing. See Moss v. Spartanburg Cnty. Sch. Dist. Seven, 683 F.3d 599, 604–05 (4th Cir. 2012). See also Freedom From Religion Found., Inc. v. Lew, 773 F.3d at 819 ("a plaintiff cannot establish standing based solely on being offended by the government's alleged violation of the Establishment Clause.") (citing Valley Forge Christian Coll., 454 U.S. at 485–86). In Hein, the Supreme Court rejected the taxpayer-plaintiffs claims that "having paid lawfully collected taxes into the Federal Treasury at some point, they have a continuing, legally cognizable interest in ensuring that those funds are not used by the Government in a way that violates the Constitution." Hein, 551 U.S. at 599. The Court noted that it has "consistently held that this type of interest is too generalized and attenuated to support Article III standing." Id. Moreover, if the court were to find that Plaintiffs have standing in this case, there would apparently be no limit to the applicability of taxpayer standing in Establishment Clause cases. The Supreme Court has squarely rejected the proposition that any "expenditure of government funds in violation of the Establishment Clause" falls within the Flast exception. Id. at 603.

   b.   *Lack of Alternative Basis for Standing*

   Plaintiffs have not alleged, let alone submitted affidavits or other evidence, showing any injury in the form of direct harm that might allow the court to find standing on grounds other than taxpayer status. See Hinrichs, 506 F.3d at 600 (noting that in addition to taxpayer standing, "[i]n the context of an alleged Establishment Clause violation…allegations of direct and unwelcome exposure to a religious message are sufficient to show the injury-in-fact necessary to support standing."). See also Barber v. Bryant, No. 3:16-CV-417-CWR-LRA, 2016 WL 3562647, at *14

(S.D. Miss. June 30, 2016) (citing affidavits of individual plaintiffs in the record and finding standing as to plaintiffs who alleged injury in the form of psychological consequences caused by state law); Moss, 683 F.3d at 607 (citing statements made in affidavits submitted by plaintiffs who attested that a public school district program offering academic credit for off-campus religious instruction made them "feel like outsiders" in their own community, and that they changed their conduct in adverse ways as a result of that perceived outsider status). Courts have recognized that "[m]any of the harms that Establishment Clause plaintiffs suffer are spiritual and value-laden, rather than tangible and economic. Consequently, plaintiffs have been found to possess standing when they are spiritually affronted as a result of direct and unwelcome contact with an alleged religious establishment within their community." Moss, 683 F.3d at 605 (citations, quotation marks, and alterations omitted).

However, recognizing the absence of such allegation or evidence in the record, the court is compelled to note that there exists the potential that a citizen could suffer real or emotional harm as a result of S.B. 2. Because a magistrate's "sincerely held religious objection" is secret, a person appearing before a state magistrate on a matter in said magistrate's jurisdiction will not be aware of a potential bias against them. A law that allows a state official to opt out of performing some of the duties of the office for sincerely held religious beliefs, while keeping it a secret that the official opted out, is fraught with potential for harm that could be of constitutional magnitude. The fact that a judicial officer has a strongly held religious belief that is so strong that it has caused them to decline to perform a lawful duty of their office, coupled with the inability of a litigant to discover that fact and request recusal, could provide the necessary injury. But such matters must be dealt with as they arise. Because Plaintiffs do not have standing as taxpayers to challenge S.B.

-35-

2, and because they assert no other basis for standing, the court lacks subject matter jurisdiction over their Establishment Clause claim.

### 2. *Standing as to Fourteenth Amendment Claims*

To the extent that Plaintiffs attempt to assert standing for their Fourteenth Amendment claims based on Flast and taxpayer standing, such arguments cannot succeed. The Supreme Court has made clear that Flast does not extend to actions other than those arising under the Establishment Clause: "[w]e have declined to lower the taxpayer standing bar in suits alleging violations of any constitutional provision apart from the Establishment Clause." Hein, 551 U.S. at 609 (citing Tilton v. Richardson, 403 U.S. 672 (1971) (no taxpayer standing to sue under Free Exercise Clause of First Amendment). See also DaimlerChrysler Corp., 547 U.S. at 333–34 (no taxpayer standing to sue under Commerce Clause) ("Although Flast held out the possibility that 'specific [constitutional] limitations' other than the Establishment Clause might support federal taxpayer standing, only the Establishment Clause has been held to do so since") (citing Flast, 392 U.S. at 105); United States v. Richardson, 418 U.S. 166, 175 (1974) (no taxpayer standing to sue under Statement and Account Clause of Article I); Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 228 (1974) (no taxpayer standing to sue under Incompatibility Clause of Article I). Plaintiffs acknowledge that no court has ever allowed taxpayer standing to form the basis of a Fourteenth Amendment claim. This court will not be the first to do so absent any authority indicating that doing so would be in accordance with law and the general principles of stare decisis. See, e.g., Goudy-Bachman v. U.S. Dep't of Health & Human Servs., 811 F. Supp. 2d 1086, 1106–07 (M.D. Pa. 2011) ("This court is bound by the principles of stare decisis and must reasonably interpret, not create, law.") (emphasis in original). While Plaintiffs present an

interesting argument that S.B. 2 runs afoul of recent Due Process and Equal Protection jurisprudence, see Obergefell, 135 S. Ct. at 2604–05 ("the right to marry is a fundamental right inherent in the liberty of the person, and under the Due Process and Equal Protection Clauses of the Fourteenth Amendment couples of the same-sex may not be deprived of that right and that liberty."), the court ultimately finds that taxpayer standing is simply not an appropriate means for Plaintiffs to bring their Due Process and Equal Protection claims before the court.

As Plaintiffs have made no allegations of an "injury in fact" that might otherwise allow them to assert standing in this case, Plaintiffs have failed to meet their burden of showing they have standing to bring Due Process and Equal Protection claims. Accordingly, because Plaintiffs lack standing to bring their Fourteenth Amendment challenges, the court lacks subject matter jurisdiction over them and this action must be dismissed.[7]

## III.  CONCLUSION

For the reasons stated herein, the court finds that while Defendant is a proper party to this lawsuit and venue is proper in this district, this court lacks subject matter jurisdiction over this action because Plaintiffs lack standing to bring the claims asserted. The court will therefore dismiss this action. See Fed.R.Civ.P. 12(b)(1); 12(h)(3).

## ORDER

---

[7] Regarding the parties' arguments on prudential standing, the court finds no need to analyze them here given that Plaintiffs have failed to show Article III standing. See Doe v. Virginia Dep't of State Police, 713 F.3d 745, 753 (4th Cir. 2013) ("Because we conclude that Doe is unable to meet the requirements for Article III standing for the bulk of her claims, we need not engage in prudential standing analysis."); Freedom From Religion Found., Inc. v. Lew, 773 F.3d at 822 ("Because we hold that the plaintiffs in this case do not meet the constitutional standing requirements, we need not reach the question of prudential standing.").

-37-

**IT IS THEREFORE ORDERED,** that Defendant's Motion to Dismiss (#38) is **GRANTED**, and this action is **DISMISSED** for lack of subject matter jurisdiction.

Signed: September 20, 2016

Max O. Cogburn Jr.
United States District Judge

-38-